RANKEN ET AL., APPELLANTS V. PATTON ET AL.

1.  **Equity, Jurisdiction to Set Aside Deeds**:  UNDUE INFLUENCE. When it is shown that a deed of gift, executed by a woman twenty-three years of age in favor of her two aunts, with whom she was at the time living, and by whom she had been brought up from infancy, was not her spontaneous act; that it arose from suggestions of others, and was pressed upon her as a moral obligation, the pressure coming in part from her uncle, who had been her guardian, and in whom she reposed implicit confidence; that no motive of affection or gratitude prompted her; that her act was the result of habitual deference to the opinion of her uncle, and was no intelligent judgment of her own; that she did not at the time know what was the amount or value of the property she was conveying, and her uncle, though possessed of the knowledge, failed to disclose it to her—such deed will, on the petition of the grantor, be set aside as having been obtained by the exercise of undue influence over her.

2.  ——:  A court of equity will set a deed aside for undue influence exercised over the grantor by a third person, the same as if it was exercised by the beneficiary in the deed. The latter takes it subject to the taint of improper influence.

*Appeal from St. Louis Circuit Court.*

The case was tried at special term, before HON. JAMES J. LINDLEY, one of the judges.

*Hitchcock, Luhke & Player* for appellants.

Appellants submit the following as the correct propositions of law applicable to this case, and the proof appearing in the record, together with some of the many decisions supporting the same:

(A.)   This deed cannot be permitted to stand in equity if it appear—

*a.*   That the beneficiaries thereunder had in fact occupied towards the donor a relation *quasi* parental or otherwise intimate or confidential, if by reason of such relation they had in fact acquired or might have acquired control or strong personal influence over her; and this principle applies in every case or description of intercourse where from the facts in proof it appears that such relation existed, and that such influence was or might be obtained by reason of the same; unless the beneficiaries under said deed shall have fully satisfied the court beyond all doubt or suspicion, that such relation between said parties had not only in name but in fact completely ceased, so that the donor was able to act and did act in the premises with absolute freedom from any such influence, and perfectly free, independent and unbiased; and, unless also, they shall have proved, beyond all doubt or suspicion, that the donor in making such alleged gift was in fact completely informed of the extent of her interest in the property affected or disposed of by such conveyance, and did both intelligently and voluntarily part with the same upon the fullest deliberation and under circumstances which completely satisfy the court of the most abundant good faith on the part of the donee.   And even though the donor, at the time of the gift, had attained her legal majority, yet if the intimate relations in question, continued up to the time in question, or even if such relations (having previously been of a *quasi*

parental character) had but recently terminated, then, also, the foregoing doctrine applies in full force: *Garvin v. Williams*, 44 Mo. 476; S. C. 50 Mo. 211; *Cadwallader v. West*, 48 Mo. 496; *Yosti v. Laughran*, 49 Mo. 598; *Huguenin v. Baseley*, 14 Vesey 300; S. C. 3 Wh. & T. L. C. Eq. 119, 123; *Hoghton v. Hoghton*, 15 Beavan 299; *Gale v. Wells*, 12 Barb. 84; *Gibson v. Jeyes*, 6 Ves. 267; *Archer v. Hudson*, 7 Beav. 551; *Cooke v. Lamotte*, 15 Beav. 240; *Slocum v. Marshall*, 2 Wash. C. C. Rep. 397, 400, approved 8 How. 201; *Fish v. Miller*, 1 Hoffm. Ch. 270; *Gaither v. Gaither*, 20 Ga. 721; *McCormick v. Malin*, 5 Blackf. (Ind.) 523; *Andrews v. Jones*, 10 Ala. R. 419; *Murray v. Palmer*, 2 Sch. & Lefr. 474; *Furnam v. Brooks*, 9 Pick. 234; *Wood v. Downes*, 18 Vesey 127; *Maitland v. Irving*, 15 Simon 437; *Goddard v. Carlisle*, 9 Price 169; *Mellish v. Mellish*, 1 Sim. & Stu. 145; *Hylton v. Hylton*, 2 Ves. Sen. 547; *Wright v. Proud*, 13 Ves. 138; 1 Story's Eq. Jur., §§ 258, 307, 308, 311, 313, 317, 320, 323; *Richardson v. Linney*, 7 B. Monr. 573.

(B.) Furthermore, in weighing the evidence to which the foregoing propositions are to be applied, the court will adopt and act upon the following principles established in cases such as below cited:

1. That the existence, (either at the time of the alleged gift, or at a recent previous period,) of such a relation between the donor and donees as above supposed being proved, the invariable presumption of law is that the act of bounty under such circumstances was procured by fraud or undue influence; that such presumption arises from the mere relation of the parties without further proof. *Butler v. Haskell*, 4 Dessaussure 704; *Harvey v. Mount*, 8 Beav. 452; *Meek v. Perry*, 36 Miss. 190; *Gaither v. Gaither*, 20 Ga. 721; *Sears v. Shafer*, 1 Barbour (N. Y.) 417; *Griffiths v. Robins*, 3 Mad. 105; *Richardson v. Linney*, 7 B. Monr. 573; *Morse v. Royal*, 12 Ves. 371.

2. That such presumption having once arisen by the mere proof of such relations between the parties as above stated, the court will view the whole transaction with "an

almost invincible jealousy," and will require of the defendants "clear and distinct evidence," which shall completely "overthrow and repel the presumption which the law so raises." *Hatch v. Hatch*, 9 Ves. 297; *Dawson v. Massey*, 1 Ball & B. 232; *Cadwallader v. West*, 48 Mo. 502; *Aylward v. Kearney* 2 Ball & B. 478; 1 Story's Eq. Ju. §§ 319—20, and cases cited. It must be shown not merely that the person likely to be influenced fully understood the act he was performing, but also that his consent to perform that act was not obtained. by reason of the influence possessed by the person receiving the benefit. Per Romilly, M. R. in *Hoghton v. Hoghton* 15 Bev. 299.

3. That such evidence must in all cases be furnished by the beneficiary; ordinary rules of evidence as to the burden of proof being reversed by the rule of equity, which presumes fraud from the existence of confidential relations between the parties and benefit to the party having or who may have influence over the other. 1 Story Eq. Jur. § 311; *Huguenin v. Baseley*, 14 Ves. 300; S. C. 3 Wh. & T. L. C. Eq. 119; *Meek v. Perry*, 36 Miss. 190; Greenfield's estate, 14 Pa. St. 489; *Breed v. Pratt*, 18 Pick. 115.

4. That in addition to the presumption of fraud or undue influence so raised by the law from the mere relation of the parties, the court will take notice of other circumstances as in themselves furnishing additional presumption of fraud or undue influence, and as "intensifying" the presumption of fraud arising from the relation of the parties.

Among these circumstances are—

*a.* Improvidence in the transaction or unreasonableness in the act or amount of the gift, all things considered. 1 Story's Eq. Jur., §§ 118, 119, and cases cited; *Pusey v. Desbouvrie*, 3 P. Wms. 321; *Evans v. Llewellyn*, 1 Cox 340; *Buffalow v. Buffalow*, 2 Dev. & B. Eq. 252; *Harvey v. Mount*, 8 Beav. 439: *Blackie v. Clark*, 15 Beav. 600; *Dent v. Bennett*, 4 Myl. & Cr. 273; 3 Wh. & T. L. C. Eq. p. 122.

*b.* The non-intervention of a disinterested third party or professional adviser for the protection of the donor and

in a manner wholly independent of the donees; *a fortiori* if it appear that the donor, whether from ignorance or inexperience or because of her previous or existing relations with the donees was unlikely to act with perfect freedom and independence in default of such aid. *Revett v. Harvey,* 1 Sim. & Stu. 502; *Cooke v. Lamotte,* 15 Beav. 243–4; *Sears v. Shafer,* 1 Barbour (N. Y.) 415; *Dent v. Bennett,* 4 Myl. & Cr. 273; *Dawson v. Massey,* 1 Ball & Beat. 235; *Griffiths v. Robins,* 3 Mad. Ch. 105; *Buffalow v. Buffalow,* 2 Dev. & Bat. Eq. 253.

c. The fact that at the time of the alleged gift the donor was a member of the family of the donees and in daily intercourse with them; *a fortiori* if there be any evidence tending to show that the donees in the least degree took advantage of such family intercourse or the opportunity it afforded. *Harvey v. Mount,* 8 Beav. 447; *Archer v. Hudson,* 7 Beav. 558; *Aylward v. Kearney,* 2 Ball & B. 478; *Hatch v. Hatch,* 9 Vesey 297.

d. A belief or impression 'on the mind of the donor that she was under some *moral obligation* (other than the spontaneous impulse of affection or gratitude) so to benefit the donees, it also appearing that such belief affected her conduct while no such obligation really existed; *a fortiori* if such belief or impression was either caused or encouraged by the donees or by others to their advantage with their knowledge and connivance or consent. *Taylor v. Taylor,* 8 Howard 199; *Sears v. Shafer,* 2 Selden 268; *Slocum v. Marshall,* 2 Wash. C. C. Rep. 400; *Boney v. Hollingsworth,* 23 Ala. 700.

e. Failure on the part of the donees (it appearing that they could have done so) to take in good faith such steps as were requisite to completely inform the donor of the actual extent of the interests affected or surrendered by her gift and of the complete effect and consequences of her proposed bounty; and also to remove from her mind any such mistaken impression of obligation as above referred to if the same to their knowledge existed. *Kay v. Smith,*

21 Beav. 522; *Fish v. Miller*, 1 Hoffm. Ch. 270; *Dally v. Wonham*, 33 Beav. 154.

*f.* Evidence tending to show that the donor in making the alleged gift was in fact influenced by the hope of securing from the donees ulterior advantage already due to herself from the donees and in their power, and which they withheld.

(C.) Independently of the above, if even in the absence of any proof of actual fraud, the gift should appear to have been made under circumstances of improvidence or under circumstances of surprise in the sense of those terms respectively, which is recognized and declared by courts of equity, then without reference to the question of actual fraud the gift cannot stand. 1 Stor. Eq. Jur. §§ 117–120, and cases cited; *Pusey v. Desbouvrie*, 3 P. Wms. 321; *Pickering v. Pickering*, 2 Beav. 56; *Evans v. Llewellyn*, 1 Cox, 340.

(D.) Further, even had the plaintiffs wholly failed on the proof to establish either actual or constructive fraud or undue influence *against the defendants Mary and Sarah Patton personally* (which failure appellants deny), yet on the proof made of the actual improvidence and ignorance of the (real) plaintiff in making the gift, and of the constructive fraud established as against Thomas R. Patton by his own letters in evidence, the actual donees cannot be permitted in equity to profit by a wrong so committed for their benefit and with their knowledge; and this on grounds of public policy. *Huguenin v. Baseley*, 14 Ves. 273; *Bridgman v. Green*, 2 Ves. sen. 627; *Whelan v. Whelan*, 3 Cowen 578; *Harris v. Delamar*, 3 Iredell Eq. 221; *Cooke v. Lamotte*, 15 Beav. 249; 1 Story's Eq. Jur. § 256; 3 White & T. L. C. Eq. 151.

*Sam. Reber* for respondents.

The case may be considered under two heads:

1. Duress and fraud in fact.
2. Fraud in law, or constructive fraud.

I.   The petition makes numerous and distinct specifications of fact, which may be considered separately.

   *a.*   That when the suit confirming the compromise was pending, plaintiff was living in Ireland, under the care of her grandmother, and that she was a pupil at school, and together with defendants, Mary and Sarah, lived with and had been under the care and control of her grandmother ever since 1849 ; that she was an orphan and so situated that she could only look to her grandmother and aunts for advice and information touching the estate to which she was entitled under the compromise agreement.   The first part of the specification is true, but the last part is untrue. She was able to and in point of fact did look to other persons, who were much more capable of giving such information ; and did get such information from these persons, chiefly from the defendant, Thomas R., and her brother, William Marcus ; and plaintiff acted on information and advice of other persons exclusively, and not on the information, advice or persuasions of her grandmother or aunts.

   *b.*   That at the time when the conveyance was executed, she had no " definite information" as to the amount or value of the estate, and defendants Mary and Sarah, and their mother, did contrive to prevent her from receiving such information, by refusing her any interview with any persons who would be likely to give her information in respect thereto.   The first part of this specification is only true in a qualified and unimportant sense.   She did not know the value of the estate in figures, but she knew that she was dealing with the estate of Robert Ranken, and that it was of pretty large value.   This appears by what I have shown under the first specification ; also, from her exaggerated statement of the value to Miss Cunningham, as shown in her deposition.

   *c.*   That while plaintiff was under the influence and control of her grandmother and aunts, they all represented to her that her interest in the estate of Robert and David Ranken came by inheritance from Robert Ranken, on the

ground that she was the granddaughter of Mrs. Mary
Patten, and was also herself a native-born citizen of the
United States, while they were aliens and therefore could
not inherit; yet they, the defendants Mary and Sarah, were
really and "in justice" also entitled, though not by law, to
a share of the said estate. The facts stated in the speci-
fication are literally and perfectly true, and if the represen-
tation was made as stated, it shows that plaintiff was fully
advised as to how she came by the property.

*d.* "And plaintiffs also state, that on the ground so
represented by Mrs. Mary Patton and defendants Mary and
Sarah, the said Mrs. Mary Patton, in behalf of said other
defendants Mary and Sarah, did from time to time, while
plaintiff was yet a minor and was under her control, urge
plaintiff to divide with her aunts, Mary and Sarah, what
the plaintiff would receive from said estate." This specifi-
cation is untrue, and is wholly unsupported by any evidence.
The plaintiff, both in the petition and in her testimony,
mystifies and misrepresents her age. She was between 24
and 25 years old when she executed the deed.

*e.* "That plaintiff did decline to comply with said
request; that thereupon her grandmother and aunts did
represent to her that her brother had assigned a part of
his interest in the estate to her aunts, and did urge that
fact as another reason why she should do so." This is un-
true, and especially as it contains the false implication that
she got information of her brother's conveyance from
them, when in fact she got it by correspondence with her
brother, as the letters in the record show.

*f.* "That thereupon plaintiff wrote to defendant,
Thomas R., and did ask his advice in reference to said re-
quest, and did receive his answer declining to give advice.
That upon receipt of her uncle's letter, she still declined to
comply with said request, and thereafter the request was
repeated from time to time by her grandmother and aunts."
This specification is untrue. The plaintiff's deposition, and
her letter to her uncle Thomas R., dated September 17, 1865,

show she wrote to her uncle in consequence of what her brother wrote her. That letter also shows, by the strongest possible negative evidence, that her grandmother and aunts had not asked her to make the deed, or she would have mentioned the fact to her uncle in connection with the statement that Wm. Marcus had requested her to do it.

*g.* "That thereafter, defendant, Thomas R., at the request of William Marcus, did cause the said conveyance to be prepared." Not true; the deed was prepared at the instance of Wm. Marcus—see page 481 of record—"and did forward the same from Pennsylvania to defendant Mary." It was forwarded by Wm. Marcus to plaintiff, and not defendant Mary—record, same page—"who received the same on or about the 16th day of January, 1866." Not true; it was received at Crindle, on the 7th of January— p. 243 of record—"that on said last named day, plaintiff and defendant Sarah were away from home, some ten or twelve miles off, on a visit to some friends; that on the same day she received the said deed form so forwarded to her, the defendant Mary followed the plaintiff and defendant Sarah, and joined them when they were on a visit as aforesaid." Not true: Mary did not *join* them until January 12th—page 243 of record—"and insisted that they should return home at once, although it was late in a winter afternoon; that they, plaintiff and defendants, Sarah and Mary, did return at once, and reached home late at night." Not true—record p. 243—"and immediately after such return home, the said deed was produced, and plaintiff again requested to execute it." Not true—see same page.

*h.* That plaintiff did not read said instrument, not being able to understand its effect, but was informed by defendants and her grandmother, that it would, if executed, convey to defendants one-fourth in all of the property which plaintiff had acquired from Robert Ranken's estate, and that such conveyance would only convey a life interest in such one-fourth thereof; and with that express under-

standing of the contents and effect of the deed, she on that day consented to sign it. This is untrue, for the deed was carefully read over by plaintiff and defendant Mary together—see plaintiff's testimony, and testimony of defendants Mary and Sarah.

*i.* That after the conveyance was executed, the same was retained by defendants Mary and Sarah, and they caused the same to be recorded. This is untrue; the plaintiff made two copies of the deed, and sent it to defendant, Thomas R. See plaintiff's deposition, together with her letter to him, in appellee's statement of the case; see, also, her letter to her brother of the date of January 16, 1866; also, her letter to Thomas R. of the date of March 8, 1866. The fact testified to by the plaintiff, that her aunt Mary requested her to make two copies of the deed and retain one of them, disproves the alleged misrepresentations as to the character of the conveyance, and the quantity of interest thereby conveyed; for why, if the grantees had led the plaintiff to believe she was only conveying a life estate, should they take the most effective measure to undeceive her?

*j.* That during the same year, and after the deed had been executed and gotten into the possession of the defendants, Mary and Sarah, they became very unkind to plaintiff, and so mistreated her that she was forced to leave their house, and did so. This is untrue, as shown by the testimony of the defendants, Mary and Sarah, and other witnesses. It is also rebutted by the letters written by her to her aunts and exhibited in evidence.

I. The question of constructive fraud does not really arise on the pleadings in this case, but inasmuch as the evidence fails to sustain the charge of actual fraud and duress, it may be attempted to sustain the petition on the theory of constructive fraud.

*a.* The petition charges actual fraud, specifying the facts and failing in the proofs. The plaintiff is not entitled to turn round and ask relief, as if the petition had been

drawn with a different aspect.   *Eyre v. Potter*, 15 How. 56 ;
*Price v. Berrington*, 7 Eng. Law and Eq. 254.

   *b.*   But if the question can be supposed to arise in the
case under a liberal view of the pleadings, I insist there is
no constructive fraud shown.   It is admitted as well as
settled law, that if a person, under the influence of fiduci-
ary or confidential relations, makes a gift to one having
such influence, the gift is presumptively fraudulent.   The
presumption arising from the relation of the parties
amounts to proof of fraud, and dispenses with necessity of
establishing it by other evidence.   But it is a disputable
presumption, and may, like any other evidence, be rebutted
by counterproofs.   It is admitted that, according to the
commonly received doctrine, parents, or persons standing
in *loco parentis*, are subject to the rule, though this is denied
by the Supreme Court of the United States in *Jenkins v.
Pye*, 12 Peters 253.   The defendants, Mary and Sarah, and
their grandmother, if they are at  all to be considered as
standing in an  influential relation to plaintiff, must be re-
garded as in *loco parentis*.   It is further admitted that trans-
actions between parties sustaining this relation towards
each other, are watched with jealousy and " weighed in
golden scales " by the courts, and " that whilst that domin-
ion lasts, it lies on the parent upholding the transaction or
maintaining the gift to disprove the exercise of parental
influence by showing that the child was really a free agent,
and had competent independent advice, or had at least
competent means of forming an independent judgment,
and fully understood what he was doing, and was desirous
of doing it."   Kerr on Frauds and Mistakes, pp. 179, 151.

   But looking at the decisions in all the well-considered
cases, it appears clear that the presumption of fraud arising
from the influence of fiduciary or confidential relations, is
completely rebutted and overthrown, where it is shown by
the grantee or donee—

   1st.   That the gift was reasonable.   That is, that con-
sidering all the circumstances—the relation of the parties,

the value of the donation, and the motives for making it—
it was a proper thing to be done.   Now, the purpose of the
plaintiff—to bestow upon her aunts a portion of the prop-
erty, to which, morally but not legally, they were just as
much entitled as she was—was, under the actual circum-
stances, eminently just and commendable.   And in this
connection, it is a matter of no consequence what was the
exact value of the gift, or whether the exact value was
known to the donor, provided that she had an intelligent
idea of the magnitude of the donation.   It is not the case
of moneyed equivalents, where certain rights are granted
for a specific sum of money—in which case, it is admitted,
it is or may be material to know the exact value of the
rights granted.

2nd.   That the gift was understandingly made.   That
is, that the donor fully comprehended the nature and effect
of the act he was doing, and knew the value of the
gift—not in figures, but in such an intelligent conception of
its magnitude as to preclude the supposition that he was
deceived as to its value.

3rd.   That the gift was voluntarily made; and,

4th.   That the will, or intention to make it, was not
produced by any influence, act, artifice or contrivance of
the donee.   This is the important point, as appears from
the judgment of Lord Eldon in the leading case of *Hugue-
nin v. Baseley*, 14 Ves. 273.   Tested by these rules, the gift
of the plaintiff is abundantly sustained by the evidence in
the cause.   It was reasonable, (nay, highly commendable.)
It was understandingly made.   It was voluntary, and the
disposition to make it was not produced by the donees, or
any body in their interest, or by any influence growing out
of their relations to the plaintiff.   The deed was deliber-
ately made, after consultation with, and with the advice
of disinterested parties, who were the most competent to
advise, and who always took a most friendly interest in the
plaintiff's welfare.

NAPTON, J.—This suit was instituted in 1870, at the October term of the circuit court of St. Louis. It was tried at the October term, 1873, before Judge Lindley, and the petition was dismissed, and a decree made to that effect. A motion for rehearing during that term was overruled at the June term, 1874. At the general term of said circuit court, held during the same month, this decree at the special term was affirmed and appeal taken by the plaintiffs. The object of the suit was to have a deed which had been executed by Sarah Patton on the 17th of January, 1866, set aside, and declared of no validity. The nominal plaintiffs are her trustees in a marriage settlement, made subsequent to her marriage with Thos. J. L. Ranken. The grounds upon which the petition seeks to set aside this deed are "willful, material and fraudulent misrepresentations, and by exercising undue influence over and by compulsion," on the part of the grantees. These grantees, defendants in this suit, were two aunts of the real plaintiff, Sarah.

Before proceeding to state the proofs upon which the specific allegations of the petition are based, the questions at issue will be better understood by a brief history of the origin of the property in dispute, and of the relations of all the parties to it. Robert Ranken, a native of Ireland, emigrated to this country in early life, and accumulated a large estate in St. Louis. He died in 1849, without children and intestate. The only brother he had in the United States was David Rankin, a naturalized citizen, who lived in Philadelphia, and who claimed and obtained possession of the entire estate, as sole heir, his brothers and sisters being aliens. The two brothers, Robert and David, had a sister, Mary, living in Ireland, who had, by her husband, Joseph Patton, five children—all born in Ireland, viz: Marcus, Mary, Hugh, Sarah and Thomas R. One of the children of Marcus is plaintiff in this suit, and Mary and Sarah, her aunts, are the persons to whom was made the deed, now sought to be avoided, and Thomas R. Patton is their

brother, who lived in Philadelphia, and who is also made a defendant. Marcus Patton had two children, born in the United States, the youngest of whom is the real plaintiff in this case. In 1849 she was probably 7 or 8 years old, her exact age not being established. The two children of Marcus were at this time taken by their father to Ireland, and put under the care of the defendants, Mary and Sarah Patton, their aunts, and their grandmother Mary, who was still living. The father soon returned to this country, and died in 1849 or 1850. The boy, Wm. Marcus, brother of the plaintiff, Sarah, at an early period, before he was 21, went to Australia, and from there came to the United States, in 1862, and his adventures are not material. David, who as before stated, took possession of his brother Robert's estate, was also unmarried, and died in 1859, and by his will divided his estate in three parts, and gave legacies of $14,000 each to the children of his sister, Mary Patton, except that he left to the children of Marcus only $1,000 each, the youngest of whom was then probably 17 years old, and is the real plaintiff in this case.

The plaintiff was, as before stated, taken to Ireland by her father when seven years old, and placed under the care of her grandmother and aunts, in 1849. They lived at a place called Crindle Cottage, Londonderry county, where she was sent to school in the village until 1859, when she was sent to boarding school. Her treatment by her aunts during this period, is a subject which occupies a large space in this record of five hundred pages of printed matter, but in our view is immaterial. It seems that during the lifetime of David Ranken, his title to the estate of his brother Robert had been a subject of discussion, and the claims of the two children of Marcus Patton, who were born in the United States, had been called to his attention. Thos. R. Patton, the uncle of these children, was engaged in business with his uncle, David Ranken, at the time of the death of Ranken, and was apprised of these claims. Therefore, on the death of David Ranken, who had moved to St. Louis

on his accession to the estate of his brother Robert, Mr. Patton, upon the advice of lawyers, went to St. Louis to institute the necessary proceedings to establish this claim, but after meeting with the legatees of David Ranken, who had moved to this country in order to obtain their legacies, consented to a compromise with them, which resulted in the establishment of the claim of plaintiff and her brother, to one-fourth of the estate. This compromise was formally made and finally sanctioned by a decree of the Supreme Court of this State. The amount thus received by these children may be stated as about $240,000, or $120,000 to each. We have not examined the detailed estimates of the property, and we only use these figures for convenience, since the exact value is unimportant. The deed of Sarah Patton, (plaintiff) which is now sought to be annulled, was made on the 17th of January, 1866, when the grantor was probably 23 years old. She had finally left her boarding school, and was on a visit with her aunt Sarah to Agha-doey, when the letter containing the deed was received at the Cottage. The deed was drawn up in Philadelphia, at the instance of her brother Marcus, who had previously made a similar one and forwarded it to Ireland. The following letters will explain, or at least afford the only explanation which the record discloses, of the origin of this deed :

EXHIBIT NO. 44.—WM. MARCUS PATTON TO MARY PATTON.

Philadelphia, August 4th, 1865.

Dear Aunt :—I take the time to send you a few lines to let you know that I am married since the 28th of November last. I do not know if it suits your ideas, but I have no reason to complain whatever. She has been extremely kind to me when I was *very* sick, but I am quite well again. I am also sorry to state to you about the death of uncle Hugh. I *supose* sister Sarah told you all when I wrote last. I cannot express to you how sorry I feel about him, I must stop on that subject, excuse me for the pre-

sent. There is something that I would beg of you and aunt Sarah to *except* of, as I think it but my duty to do it; that as grandma receives nothing from uncle David Ranken, so as it has been my intention to have you and aunt Sarah on equality, I give what I say *volentry* and with a good will and kind heart one fourth to you and one fourth to aunt Sarah, but the interest to go to grandma while she lives, which will not be a great while. In my next letter I will send you a *coppy* of a document that I have drawn up to that effect by a *lawer*. I forgot to state that I have intended to do this ever since I left you last, so I will write to you in a short time from *now*. Uncle Thos. was at St. Louis during the time that I was sick and has returned quite safe; I had a *nuse* paper from Sarah yesterday with a note endorsed in it. Sarah states that Aunt Sarah and Grandma was very sick also herself, which I am very sorry for all of them, but hope that they all will recover soon. All is quite well at present, with kind love to grandma & Aunt Sarah also *except* the same yourself, I remain your ever affectionate Nephew

WM. M. PATTON.

I ought to have stated to you and Aunt would have the same if Sarah would give a $\frac{1}{4}$ the same as me. I am writing to Sarah by the same mail as this goes by, and stating to her what I am doing and I think it but her duty to do the same, but you need not say I *tould* that I was writing to her on any subject whatever. My address to Uncle Thomas R. Patton's store, Philad., America you know uncle's address.

EXHIBIT NO. 45.—WM. MARCUS PATTON TO HIS AUNTS, NOV. 16, 1865.

Philadelphia, November 16th, 1865.

My dear Aunts :—I promised you soon after my last letter, the accompaning copy of Deed to you by myself and wife, deeming it necessary that it should be placed on

record the original was forwarded to St. Louis for that purpose, and only a *fue* days ago a copy thereof was again placed within my reach and hence my delay. Martha and myself both feel truly grateful and sincerely thank you for your letter duly received. It is seldom so kind a letter is bestowed on one so undeserving as myself. I sincerely hope and trust I will be enabled to " mark well" your kind suggestions and make my married life not only happy to myself but also to my wife and family. From your letter I infer that you do not understand fully the character and nature of the transfer which we have made to you, and therefore *bare* with me whilst I give you a synopsis of the matter and the reasons for our so doing and from which you will more fully understand it. By reference to Uncle David Ranken's will, you will perceive that his large estate consisting of the real estate was entirely left to Uncle Thomas Ranken and families of Uncle John Ranken and Aunt Ann Ranken. Nor was this all the *magor* part of his personal estate was disposed of in the same manner. I believe all but about sixty thousand dollars. Fifty-eight thousand of which came to Uncles Hugh and Thomas, Yourselves sister Sarah and myself· grandmother not mentioned. The cause of this invidious distinction in the case of my respected and honored grandmother became a question of inquiry with Uncle Thomas on satisfying himself he obtained able legal counsel to unravel the apparent mystery. After the necessary examinations were made it was apparent that the title to a certain portion of Uncle Robert Ranken's real estate (who you will recollect died intestate) was vested in my sister Sarah and myself. Uncle David in accordance of the laws of Missouri, deeming himself sole heir to Robert's real estate under legal counsel took possession of the same, but undoubtedly the impression rested on his mind of our right, and hence he framed his will accordingly, believing that in law it would be reclaimed and hence the apparent inequality, for had he bequeathed to Grandmother or her children an equal portion with the

other three parties before named and this claim of ours afterwards obtained it would have made the Patton interest much larger than the others, as it now is, the interests are about equal. Having showed you the condition of affairs and the conclusions arrived at, in due time uncle Thomas, as our representative, apprised the executors and residuary legatees of uncle David of this claim vested in us in uncle Robert's real estate, and that we meant to prosecute it. They gave an attentive ear to the warning; the advice of able counsel was employed in each side for opinions and counsel relative to the matter; having obtained the opinion of six or more able lawyers, and after mature deliberation by the parties interested and their representatives, it was deemed expedient to have a meeting of the representatives, viz: Thomas Ranken, Jr., David Ranken, Jr., Hugh L. Ranken and Thomas R. Patton in St. Louis, and accordingly in June, 1862, uncle Thomas was invited to appear in person for an amicable settlement of the matter. After much deliberation, and aside from all counsel in the premises, legal or otherwise, upon terms of common justice and equity between the several families, an agreement was entered into for them by the representatives for the respective parties, which was in due time confined (confirmed) by all the parties compent signing said agreement, and also by the minors afterwards, as soon as they reached their majority and were capable of doing so. It was necessary, however, that this agreement should be established by law, and therefore an amicable suit at law was agreed upon, and in due time it was brought before the Circuit Court of Missouri and confirmed by it, and from thence carried to the Supreme Court of Missouri for final adjudication. After passing two or three sessions of said court, it was acted upon and the decisions of the Circuit Court confirmed. Some months after the decision of the Supreme Court a portion of the real estate was sold; deeming this a fitting moment to carry out the determination, I had formed years ago, when I first became acquainted with the facts, if the

result was successful, either by law or otherwise, that uncles Hugh, Thomas and yourself should be placed on the same footing as uncle David, most likely would have done had this matter not stood in his way. In doing so I am bestowing no special favor; my *conceince* tells me it is only common honesty and justice. The fact that the title vested in myself and sister is *enterly* a matter of circumstance and which we have no control over. I regard it as a *privallege* and pleasure in which I am cheerfully joined by my wife in making deed to you of a *certan* portion, making you equal to myself and sister, when she makes a similar deed to myself. I should have stated that the portion I would have made over to my uncle Hugh, *whoes* eyes are now sealed in death, is equal amongst us, and that which I would have made over to uncle Thomas he absolutely refuses to take. I am satisfied that the deed we have made to you is nothing more than just and equitable and has been *consumated* by us *voluntarly* and cheerfully. With this synopsis and the copy of the deed herewith inclosed, I trust you will *throughly* understand the nature of the deed. I have been *this* explicit as I perceive you do not understand the matter nor can *realease* the fact. At this I am not astonished, as I am persuaded you have not *dremt* of such a transfer. In my last I request that grandmother should have the interest accruing from your part during her life, this, of course, I have no right to demand. My deed to you is *absolutly*, and hence my authority ceases. Out of respect to her the request is made; it is for you to grant or not as you see fit. I have written to my sister Sarah relative to a similar transfer to you as my own, and place the matter and my reasons for so doing before her. She has *delaid* a reply, waiting for counsel from uncle Thomas in the matter, but he will not advise in the matter. My own action was *volentary*, hers must be the same; however she has decided, and has instructed me to have a deed similar in effect to my own prepared and sent to her. This I hope to have attended to for the steamer. I *sincerly* hope and trust you will have not

only the enjoyments and comforts wealth affords in this *wourld,* but happiness eternal in the world to come. Kind love to grandmother and aunt Sarah, and sister Sarah, and yourself, in which I am affectionately joined by Martha.

I remain dear aunts, your ever affectionate nephew,

WM. MARCUS PATTON.

Uncle Thomas R. P. got home safe from St. Louis, and is very busy at the books.

EXHIBIT NO. 33.—THOMAS R. PATTON TO HIS SISTERS, DEC. 22D, 1865.

Philada., Dec. 22d, 1865.

My Dear Sisters:—This will be handed to you by my niece, Sarah Patton. It is accompanied by a document prepared for her at her request by her brother here, through Mr. Hood, the nature of which she will communicate to you herself. The expense of consummating it should be paid for by you. I received your kind letter of the 6th inst.; was glad to find you so well; I regret, however, to learn that mother is so feeble, I trust she will recover from this attack of her old complaint. I am much hurried but will write you by Monday's mail. Wishing you all many happy returns of this joyful season,

I remain your affectionate brother,

THOMAS R. PATTON.

From T. R. Patton, May 25, 1865.—Important Counseling. —Taking advice of Aunts.

Phila., May 25th, 1865.

My Dear Niece:—Your polite and kind letter of the 20th ult., found me at home. I do anticipate being absent a good portion of the summer. However your letters will promptly reach me. In the absence of letters from my sisters your letter was doubly welcome, as it conveyed to me the glad intelligence that they, with mother and yourself, were in the enjoyment of good health. I was also pleased to learn that you have so recently met with your aunt Mary

and had so pleasant an interview with her, which is indeed a great privilege, her judgment is so exceedingly good and her views correct that her counsel doubtless would be of advantage to you as I am sure it would be to me. Since you last heard from me the painful intelligence has reached me of the death of my poor brother Hugh. I have no particulars as to the disease or immediate cause incident to death. I have looked forward with bright anticipations towards a personal interview, when he would have depicted to my fertile imagination the many scenes of his eventful life in the far away Texan country, but "but hope tells a flattering tale of joys that never return." Our national troubles are rapidly drawing to a close, and soon it is to be hoped peace, fellowship, good will, will return all over this broad and beautiful continent. I was pleased to learn that you were so usefully employed and that your work merited the just commendation of your friends. Your determination in respect to your intended reception and treatment of a certain person *whoes* name I forbear to mention meets my approval. It should never be mentioned in connection with Patton. I was glad to see you had so decided, for there is not anything I have encountered in life that would so mortify and distress me. My dear niece, early in life you became to me, through circumstances, the same as my own child. My love, affection and desire for your education and social advancement has been no less than they would have been had you been my own child. Since we first met you have not wanted a home and a good one. Your wants have *be* amply supplied by indulgent aunts &c., a kind grandmother, of late your home (although good and the society of Miss C's excellent) is not where I would have desired it, *but* of course circumstances which is obvious to you were beyond my power to prevent. This however, I was partly reconciled to from conviction that it would be of short duration. I trust you will also take this view of it and be content and happy. So long as I live you will be amply

provided for, and you are now neither poor nor dependent on any person on earth.

My supervision over your interests has secured for you a comfortable estate. Now having reached your majority, I sincerely hope and trust and believe, that you will take a respectable, creditable and dignified position, and that in matrimony you will not madly *through* yourself away, but place yourself socially in a position equal at least, if not better than any of your friends or relatives. I have such confidence in you that I look for no disappointment in these respects. You shall have my approval and encouragement in such a union. You may consult me with confidence. You shall always have my candid views in that respect, as well as everything else pertaining to your welfare, now and in the future. Out of respect to yourself, your Aunts should be consulted even about your most trifling matters, and their approbation secured. You will feel much the better for it both now and hereafter. Their experience through life will be of vast advantage to you in shaping your course for the future. With sincere and affectionate regard, I am truly yours, &c.,

THOS. R. PATTON.

T. H. Patton, Nov. 14, '65. Cannot advise concerning assignment.

Philadelphia, Nov. 14, 1865.

My Dear Niece:—I am honored by the receipt of your esteemed favors of June, July and Sept., I have been quite remiss in not sooner replying to them. Such kind letters, which I am always delighted to get from you, deserve more promptness. It is needless for me to ask you to excuse me, for I know you will *chearfully*, knowing that I am hurried with business. I was pleased to know that you were with your Aunt and Grandma at the salt water, and that you received so much benefit from it; also, particularly so, to find you again at Crindle Cottage, my once happy and *chearful* home. Now my dear Sarah let your experience of

the past be a standing monitor on your right and left to direct you in the future. It has been a painful separation to us all. Oblige your aunts in everything—thought, word and deed. Make yourself entirely fitter for their every wish. They will not harm you. Your past life with them well suffice. Your brother and his wife are both well. She is really a very nice person, and is well calculated to make him very happy. You ask my advise relative to an assignment of some of the property° which I have secured for you from Uncle Robert Ranken's Estate to your Aunts. Now in this matter I cannot advise you. Your brother made a deed to them of a certain part. I did not object to it. I would give him no advice or counsel in the premises; his act was entirely voluntary. Yours must be so to. In justice I think it entirely right and proper, but you must govern yourself and be the judge. There is no law compelling you or can compel you to do so. I refused to take any part of the Estate to myself, which W. very earnestly solicited me to do. I now say the same to you. I will take no part of yours. My own estate is as much as I care to have. With sincere regard for your health and happiness, I am, dear Sarah, your attached Uncle.

THOMAS R. PATTON.

Miss Sarah Patton, Jr.—private.

EXHIBIT NO. 11.—S. PATTON TO MARCUS PATTON, SEPT. 27, 1865.

Crindle Cottage, September 27, 1865.

My Dear Brother:—I received your very kind letter yesterday morning, and was glad to hear you was so much better, and being at Cape May would do you a great deal of good. I have made up my mind, as you say Uncle would give you no advice; so it must be quite right when he neither said with or against it, so you may send the paper you spoke of, and be sure to address it to Miss Patton, Junr., Crindle Cottage, Myroe, Londonderry. Aunt May will get it and also my letters, as I am not sure whether I am to return to Rockfield, but I think when I go it will be

only for a day. G.ma, Aunt Sarah were at the shore for six weeks. I was there with them for the last fortnight, but am now a week past here. Aunt Sarah and I are going to Garvagh for a fortnight, but not till Aunt Mary come home from the shore. You may expect to see Hugh L. Ranken soon, as he is going out to America. I think in a week or two, and it is very likely he may have a little parcel for you. You need not write either of the two letters you spoke of, or if you do, I will be very angry at you, and let the subject rest where it is, as the less said the better. So you are not to write to Miss C. on any account. Grand Mamma and Aunts are very glad that you are going to send me a ring, and hopes it will come safe, Grandmamma is in her usual. Aunt Sarah is much better, and Mary is quite well, I myself am still continuing quite well. I hope will be quite well by the time this reaches you. I intend writing Uncle in time for this post, and as my Aunt Mary has but one stamp, I will inclose this with Uncles. With much love in which Grandmamma and Aunts join me, believe me, my dearest brother, ever your loving and attached          SISTER SARAH PATTON.

Remember you are not to write those two letters you have promised. Please give my love to Martha, and I will be very glad to hear from her.          S. P.

EXHIBIT NO. 12.—S. PATTON TO T. R. PATTON, SEPT. 17, 1865.

Crindle Cottage, Sept. 17, 1865.

My Dear Uncle :—I have been here nearly two weeks. Before that I was two other weeks at Portrush, with Grandmamma, my Aunt Sarah ; our time passed very pleasantly. Grandmamma is in her usual, able to rise every morning a little after seven, and my Aunt Sarah is much better of being at the shore. They were six weeks there. She has improved more for the last fortnight than she did all the rest of the time, and is now a great deal better since she came home. Aunt Mary is to go soon to the shore; I think it will be to Portrush. Aunt Sarah and I are look-

Ranken v Patton.

ing forward with great pleasure for her return, as we are going to Garvagh. Dr. and Mrs. McElroy have been so kind as to invite us to spend some time with them. I had a letter from William Marcus yesterday morning; he speaks of some paper he wants to send me; so if you think it is right it may come on, and he spoke of it in the letter before, and I said for him to ask you then as I could do nothing without your permission. Will you please give him your opinion, and as for my part I think it would be quite right. I was telling my Aunt Mary that I wrote you a letter some weeks ago, and I was sure you would feel angry with me for so doing. She said I was quite wrong to write anything that would either annoy or vex you, and that I should not let anybody's stories annoy me, and hear them as if I heard them not; so I hope you will look over the letter and its contents as you so kindly do many other things. I must not forget to tell you that Solomon Patton has got to his long home; he was working here on Friday and died on Monday evening; he was interred to-day, the 27th, at ten o'clock, in Tourahet. When you come home you will see a great change, as the old row is all filled up before the door, and the manure heaps are both taken away. Mr. Patton has a very nice, I should say large garden; Grandmamma has done nothing with her's yet, except to inclose it in. Miss Martin has her part planted with trees. I am sure you think it greatly improved when you see it. Dr. Hemphill has come home from Liverpool with bad health and does not intend returning. However, he is recovering slowly. I inclose a note for Marcus in this, which you will please give him, with much love, in which Grandmamma and Aunt join me, believe me, my dear uncle, ever your attached niece.

SARAH PATTON.

EXHIBIT NO. 14.—SARAH PATTON TO T. R. PATTON, JAN. 19, 1866.

Crindle Cottage, Myroe, Jan. 19, 1866.

My Dear Uncle:—I inclose this in the inside of the pa-

per. I hope you will get both quite safely. Aunt Sarah and I came home from Aghodoey on this day week. We had a very pleasant time; one week with Uncle Thomas, and another at New Park; also, one at Dr. McElroy, of Garvagh. There were some nice parties during our stay. Dancing and charades seems to be the amusement of the day. All your friends were asking of you in the kindest manner. Aunt Mary come over for us rather sooner than we had expected. Mrs. Morison had invited us to spend some time with her. The night was bitterly cold, and the ground was covered with snow. Aunt Sarah and I caught cold, but I am happy to say we are both better. On our return we found Grandmamma in her usual. Aunt Mary and I were in Derry on Wednesday last. She purchased me a very nice watch and chain, also a ring with five diamonds. She got a very nice dressing case for herself, but gave it to me the morning after. I have got nothing new in the way of work, as I intended turning my attention to plain sewing for the present. Anne and Mary Ranken, of New Park, returned to Dublin after Christmas, and Mary Anne went to Belfast the same day; they are not to return home until mid-summer. It is growing quite dark, so I must conclude with best love, in which Grandmamma and Aunts join me. Believe me, my dear uncle, ever your attached niece. SARAH PATTON.

EXHIBIT NO. 15.—SARAH PATTON TO MARCUS PATTON, JANUARY 16, 1866.

Crindle Cottage, Myroe, Jan. 16, 1866.

My Dearest Brother:—I have great pleasure in answering your long expected letter. Aunt Sarah and I were away at Lisboy for a week, another at New Park; also, one at Dr. McElroy's, three weeks in all, but we had a very pleasant time among our friends, we were at a good many parties, dancing was our principal amusement, and on my return I got your letter, also the paper. I was very sorry to hear by the letter of the death of your little daughter

Mary, but I am very glad that Martha is getting on so well. Ere this reaches you, I hope she will be quite well, and able to fulfill her promise to write to me soon. You should write Grandmamma to thank her the present of the sheets she sent you. I hope the married life has done away with all the drinking, and that you have turned over another *lief* and intend making her life who you have chosen a most happy one. It is your duty to do so, and the wife of a drunkard, I am sure is everything but a life of comfort. I hope when you are writing you will be telling me you never take stronger than tea or cold water, and you will find yourself, wife and family will be more comfortable and happy both now and the time to come, you see that I had to put off the finishing of my letter to go to Derry. Aunt Mary and I went up on Wednesday. I am now sending the paper to my uncle also a letter. I got a nice ring with part of uncles money and aunt got me a nice watch and chain, also, a dressing case. Grandmamma is in her usual. Aunt Sarah is much better since we came home except a slight cold she got coming over the mountain.

"B" all your friends over the mountain are asking for you, also for Martha they are all well and desired to be remembered to you. Jane Patton was in a little while last night, and she had a letter from Alexander in the morning. Both he and Robert were quite well. Alexander will be finished this winter. The family are all well at home. I got nothing new in the way of work except a cover for aunt Mary, she gave me the wool to do it with. I have a good deal of sewing to do before I join fancy work again. I have to write to uncle so I must conclude this with best love to Martha, accept the same yourself. Believe me my dear brother ever your attached  SISTER PATTON.

All here send their love to you and Martha.  S. P.

EXHIBIT NO. 16.—S. PATTON TO T. R. PATTON, MARCH 8th, 1866.

Crindle Cottage Myroe, March 8th, 1866.

My Dear Uncle:—Your very kind and welcome letter

reached me in due time.  I would have written sooner, only I had posted a letter to you a few days previous to its coming to hand.  My Aunt Mary gave me the letter to read that you inclosed to her, with one from yourself.  I think it is a very nice letter (if I am a judge) and the young lady who wrote it must be a superior person.  I was glad to hear, through you, that the paper I had signed had gone quite safely.  You certainly have taken an immense trouble with them, and us—more I am afraid than either my brother or I can ever repay.  I am very sorry that my brother would not, nor will not be counseled by you, and that he is degrading himself so much with strong drink. However, I hope ere long he may see his folly, and repent of the past and change his present course of going.  I had a letter from his wife sometime ago, which I answered and addressed to the care of you.  I have not heard from William Marcus's self since christmas.  I suppose he does not intend writing me again.  My Grandmamma is very poorly with her old complaint, the pain in her side, she blistered yesterday; to-day she seems a little better, but with her it is well to-day and ill the next.  Both my Aunts are as well as usual, and all our other friends over the mountain are well.  I had a long letter from Mary Ranken, of Lisboy, on this day a fortnight; she was to leave for Calraine the day after she wrote me to stay with Mrs. Hugh Tyle for some time.  There is a rumor going afloat about her and Doctor Smith, of Moddey Carrie (?) going to get married on the twenty-second of June, but to the truth I can not say, although I have heard it from good authority. My Uncle Thomas and Aunt Jane are quite satisfied so far as I can hear, so the matter rests with herself alone and it is most likely to come off.  There is nothing new about Crindle worth mentioning, except some little improvements being made opposite the door.  The ground has been inclosed, and my Aunt Mary is going to plant some evergreens, and sow some grass seed, also intends making a walk all around.  When you come home you will not know

the place, it is so much improved with the straw being away. My Aunts and I had a very nice walk over the oat lands. We all *seems* to enjoy it very much as the day was very pleasant for walking and fine for the season. My Aunt Ann, of New Park, and her son William, also Robert Ranken of Lisboy, were over here about three or four weeks since, but returned the same day, as William and Robert were to go to a fair next day. Aunt was looking very well at that time. We have not heard from New Park direct since then. Doctor Hemphill calls to see us some times. He is getting better of his long illness and is more like what he was years ago. Mrs. Hemphill is quite well; she called to visit Grandmamma for a few moments. She is keeping her young looks better than any of our friends. I think I have given you all the news I can think of, that would interest you about your friends, except myself. However, I intend taking a new piece of paper for that alone and as this is nearly all finished, I expect to hear from you soon, and I hope by that time to hear more pleasant reports from my brother's ways of getting through in the world. With kindest love and many thanks for all the trouble you have taken with me, and I hope you may still find in me a loving, affectionate and obedient niece, believe me, my dear Uncle, ever your attached niece.

SARAH PATTON.

EXHIBIT NO. 17.—T. R. PATTON TO S. PATTON, FEB'Y 6, 1866.

Philadelphia, February 6, 1866.

My dear Niece :—Your kind letter of the 19th ult. is just received, accompanied by your assignment to your aunts Mary and Sarah of a certain portion of your interest in the real estate and product thereof of Robert Ranken, dec'd recovered from the residuary heirs of David Ranken dec'd, since July 1, 1865. From the agreements that have from time to time been before you for consummation, and with which yourself familiar I have no doubt therefore

that this assignment has been consummated intelligently. Some months ago you asked my advice relative to this matter which I declined to give you, and assigned my reasons for so doing, at the same time stated that there was no law to compel such a transfer. Your brother and his wife being familiar with all the facts in this matter made a similar transfer in effect to yours. I did not advise them, neither did I oppose their so doing, nor interfere in any way more than I have with yours, because, although there was no law binding such an assignment I deem it matter of justice and common honesty. I refuse to take a part of your brother's interest to myself, because I desired (having enough of my own) that you should derive the benefits from it. I hope soon to have all the estate settled up, and I sincerely trust you will appreciate and approve all my action in the premises, and in order that you may so satisfy me. (All relative to the above matter in this letter.)

T. R. P.

The circumstances attending the delivery of the deed are differently represented by the plaintiff and the aunts who are donees. We copy both statements. The plaintiff's account is as follows :

Ans. My aunt Mary came for us to Dr. McElroy, where we were stopping, and after a tedious drive of twelve or fourteen miles we got home to Crindle between eight and ten o'clock at night. Soon after our return the same evening, my aunt Mary gave me a document or paper, which she said was the deed of assignment sent by my uncle. It was then and there read in the parlor by her and myself, this parlor was at that time used as the bedroom of my aunt Sarah, who was sick, as well as for a parlor, and she said that we would go soon and execute this deed on Wednesday, which was the day on which Mr. John Campbell, who was accustomed to attend such business would be in town.

25th Int. On the evening of your return did either of

your aunts tell you what you would assign by this document or the effect of it?

Ans. Nothing except that it was only conveying to them what really belonged to themselves.

26th Int. Is the document now handed by the defendants, and marked exhibit No. 1, the document shown you on the night of your return from Aghadoey?

Ans. It is the same.

The defendant Mary testified as follows: Coming forward she handed a paper to me, saying, aunt Mary and aunt Sarah accept this from me, a portion of my property. I give it the same as my brother William Marcus gave it. I give it voluntarily to you. I took the paper and looked at it. It was open. I correct myself. Immediately after handing me the letter (marked exhibit 33) she left the room and did not return for about fifteen minutes. She then returned and came forward to me and handed me the paper as I have above stated, and then used the language I have described in the first part of the answer. I looked at the paper on her handing it to me. I said, "Sarah, I do not require this, I have enough of my own." I handed her back the paper. She said, "Aunt accept of it, it is yours by right, though mine by law." She then handed the paper to my sister, using the same words she did to me. My sister said, "Sarah I do not require it, I have enough of my own." She said a second time, "it is yours by right, though mine by law," and we agreed to accept of it. My mother said, "girls, you have enough of your own," and that is all I ever heard my mother say on the subject, up to that time or at that time. We were seated at the parlor fire and she came with the document again to me and asked me to read it, saying that she could not read it. I took the paper, and she drawing her chair close to me, I read the paper, keeping my finger under each word, as I passed, she looking on. When I had so finished the reading the paper aloud, I suggested to her to read it for herself the next day. She took the paper and laid it

on the cabinet. I said for her not to leave it there. She then asked me to take care of it, and I did so, and put it into a drawer in my own room. This is all I have to state in answer to the interrogatory. The letter (marked exhibit No. 33) I read aloud, while my niece, Sarah, was absent, during the space of fifteen minutes, as I have described, my mother and sister listening to the reading.

The defendant, Sarah, testified: My niece, Mrs. Ranken, read the address of the letter, then turned her back and turned around again and handed my sister a letter, saying: "this is for you and Aunt Sarah, from Uncle Thomas." She then left the room. My sister then read aloud the letter to us in her absence, and laid it upon the mantlepiece. My niece returned after a little and came forward and handed my sister a document or deed, saying: "Accept of this, Aunt Mary, Aunt Sarah, it is a portion of my property, same as William Marcus gave you, one-fourth to each. My sister said, "we do not require it we have enough of our own." My sister then laid the deed down. My niece then lifted it and handed it to me, saying the same words she had said to my sister. I said I did not require it, having enough of my own. She said she knew it was ours by right, though hers by law. She asked my sister to assist her in reading the deed, and they read it together. My sister then handed her my brother's letter, and she read it, that is the letter that was on the mantle-piece. I think I then left the room. I do not recollect anything more that happened before I left the room.

After the execution of this deed and its acknowledgment at Derry, the plaintiff returned to Crindle Cottage, but being dissatisfied with her usage there, she went to Mrs. Daugherty's, and afterwards as a parlor boarder at Miss Mills' school at Ballongary, where she remained till her marriage, on December 19, 1867.

The principal question in this case is whether, under the circumstances, a court of equity will allow the deed of 1866 to stand, and our conclusion, upon an examination of

all the testimony given on both sides, we shall proceed to state, and the grounds upon which this conclusion is based. The exercise of this power to set aside deeds by courts of equity occasionally presents very delicate questions, and in such cases the conclusion on the part of the court is that in doubtful cases, it is at least the safer course to err on the side of the weaker party. Where a confidential relation exists, and the subordinate conveys to the superior, courts of equity look very narrowly into the circumstances. They require the act to be done with a reasonable knowledge of all the facts necessary to an understanding of what the grantor is .doing, especially in the absence of any motive of gratitude or affection. We deem any citation of authorities in regard to this general principle unnecessary, as they are familiar to the profession and have been so often quoted in previous decisions of this court. It may be observed in this case that the facts that the deed of 1866 did not suggest itself to the donor, and that it was not made from motives of gratitude are beyond dispute. There is not the least evidence in all the record that Sarah (the plaintiff) ever thought of conveying half of her estate to her aunts, until its propriety was suggested to her, nor does the testimony on either side. attribute the convey-ance to motives of affection or gratitude. There is in the record a great deal of testimony in regard to the treatment of the plaintiff by her aunts during her childhood at Crindle Cottage, but the details of this evidence we consider immaterial. The statements of the plaintiff are that she was badly clothed, that she was compelled to perform various menial services, and that she was kept under very strict surveilance ; and her statements are confirmed by the testimony of various witnesses. On the other hand, these statements are contradicted by the defendants, except as to the surveilance, which her aunts considered proper; by reason of some imprudences of hers. The testimony is only important to show that the deed in question, resulted from no motives of gratitude. Indeed, it is scarcely claimed

that any such motive prompted the deed, or that such a conveyance ever suggested itself to the plaintiff. It was first suggested to her by her brother in Philadelphia, a young man of bad habits, seldom sober, of feeble intellect, and without education or acquired information. Two letters from the young man are copied, the second, being evidently not an original production, containing an elaborate argument which must be credited to his lawyer or adviser.

All the testimony in this case leads to the conclusion that the plaintiff had no especial regard for her aunt Mary, who was the controlling spirit of the household at Crindle Cottage, her sister Sarah being mostly in infirm health. The testimony of the sisters, aunts of the plaintiff, and grantees in this deed, upon the return of plaintiff and her aunt Sarah from Aghadoey, shows that the deed was understood by the grantor to convey property to them which of right belonged to the donees, though the donor was the legal owner. Had such a deed been prompted by motives of affection, it would not be clear that a court of equity would allow it to stand. In the case of *Garvin v. Williams*, 44 Mo. 476, 50 Mo. 211, the testator was a young man in the last stages of consumption, without father or mother, brothers or sisters. Gratitude to his guardian and his guardian's wife prompted the will. The testator had no prospect of being able to enjoy the property, and he preferred that it should go to his guardian, who had been kind to him, instead of to distant relatives where the law would carry it. Yet this court, upon general principles established in regard to transactions between guardian and ward, set the will aside. Here the deed was made by a young girl to two ladies, unmarried and past the middle period of life and in comfortable circumstances, who had already received a conveyance from her brother of half his estate, estimated at nearly $60,000, and by the will of David Ranken received $28,000, and a considerable sum from the estate of their brother Hugh, and were in possession of an Irish farm, sufficient to support them in the position to

which they were raised and accustomed. With fixed habits in their cottage, at that time of life, what additional comforts or happiness could $60,000 contribute? It was, to say the least, improvident and unnecessary, had any feeling of gratitude prompted it. The plaintiff was just entering life, and might reasonably look forward to marriage and a family, and the loss of $60,000 might materially affect her future condition, whilst the accession of such a sum of money to her aunts could be of no practical benefit to them, unless the mere power which money gives is to be regarded as an addition to the happiness of its possessor. The only ground, however, suggested to the plaintiff, or urged in defence of the deed here, is that she was under a moral obligation, not recognized by law, to redress the injustice of the law of Missouri, which, as to lands in this State, denied to aliens an inheritable capacity. Where a party is full of age, and under no undue influence, and fully competent to examine and decide on the policy or impolicy of a law, and desires to rectify its supposed or real injustice, it would certainly not be within the province of a court to interpose objections to the accomplishment of such an object. The eldest son in England might believe that the law of primogeniture was an outrage upon justice, and upon arriving at full age, conclude to divide with his brothers and sisters, and I suppose no court in England would prevent him from so doing, on the sole ground that his opinions on that subject were extraordinary or whimsical. Such acts of generosity are, however, so infrequent, that when they occur, if in fact such an occurrence ever happened, courts will look narrowly into the circumstances to see that there is a total absence of all due influence, and that the donation was made with a complete understanding of his rights under the law. And in this country most people would think the law of primogeniture in England, though an essential part of the system of government, prevailing in that country for centuries, greatly more un-

just than our Missouri law, which, until a very recent period, prohibited aliens from inheriting real estate.

The plaintiff in this case, in 1866 a young girl, living in Ireland and raised there from her infancy, could scarcely have been competent to form any judgment in regard to the justice or injustice of a law in Missouri. Nor is there any evidence in this case to show that such a question was ever presented to her for deliberation. She simply acted in conformity to the directions of her brother and uncle, in the latter of whom she had the utmost confidence. When the suggestion came from her brother, her answer was that she would be governed entirely by her uncle, and when her uncle assured her that such a conveyance would be approved by him, the conveyance was forwarded to her and she signed it. The subsequent letter of her uncle ap-approves of it as nothing more than "common honesty required."

She had no knowledge of the amount or value of the property conveyed. She was induced to believe that common honesty required the conveyance, and as her uncle was her guardian and adviser, she implicitly followed his directions. His letters to her previously in regard to the estate she inherited had been very indefinite, and only stated that with economy she would be able to live respectably, and that, at all events, so long as he lived she would be provided for. Mr. Patton well knew, not the exact, but the proximate value of the property, and his reticence in regard to this, during her pupilage, might be justified as arising from the best of motives. But when the question arose in regard to her conveying one-half of her estate, if she was competent to do this, he must have known that she was equally competent to be apprised of what she was doing, and of how much she was conveying. It was his duty, as her guardian and agent, to protect her interests, and if he supposed that "common honesty" required her to divide with his sisters, and that she was competent to decide upon the questions of law and morals involved in

such a division, all the facts necessary to a proper understanding of the case should have been submitted to her. It is not pretended that this was done.

It has been suggested, however, in support of this deed of 1866, that the proofs of any undue influence or solicitation on the part of the donees, is unsatisfactory, and it may be conceded that, if we restrict this influence to direct solicitations, the position of the defendants on this point is sustained. The testimony of the plaintiff, the donor, is explicitly contradicted by the donees, but it is not denied that the donees had previously received a deed from the brother of the plaintiff, and also a long letter from him explaining the grounds upon which he acted, which we have copied, and were apprised by this letter that he would expect and urge his sister to make a similar deed. Whether this letter was communicated to the plaintiff or not, is a matter not satisfactorily established. We have not examined this point very particularly, because our opinion is, that it is not material to an adjudication of the main question. There is no doubt that Th. R. Patton, the brother of the two grantees and the uncle of the grantor, was principally influential in procuring this conveyance, in fact that the deed was made at his suggestion, and without the least examination by the plaintiff into the grounds upon which such a conveyance was urged upon her, and without any means furnished to her by which an intelligent examination could have been made. The only motive of the plaintiff was to comply with the wishes of her uncle, and to gratify her aunts. The letter of her brother to her aunts, if communicated, contained material misrepresentations of the history of her title. That was the result of a compromise, and not the judicial establishment of her claim to one-half of the estate of Robert Ranken, upon the ground of her nativity in the United States, and the conveyance of one-half of her interest to her aunts did not put them on an equality with her and her brother, but in truth, look-

ing at the will of David Ranken, gave them a larger share of the estate than she got.

However this may be, it is a matter which will not change the action of the court of equity, that the deeds to the aunts was principally procured by the agency of the uncle. The interposition of third persons will not purify the transaction, or enable the donees to evade the resposibility arising from undue influence. This is well settled, and the authorities go back to the opinion of Lord Eldon in *Huguenin v. Baseley*, (14 Vesey 279,) or rather to Lord Hardwick's opinion, in the case of *Bridgeman v. Green*, (2 Vesey 627,) and Ch. Justice Wilmot's confirmation of Lord Hardwick's opinion (Wilm. 64.) Lord Eldon says: "I should regret that any doubts could be entertained, whether it is not competent to a court of equity to take away from third persons the benefits which they have derived from the fraud imposition, or undue influence of others." Lord Hardwick observes in *Bridgeman v. Green*, "that if a person could get out of the reach of the doctrine and principle of this court by giving interests to third persons, instead of receiving them to himself, it would be almost impossible ever to reach a case of fraud." And Ld. Ch. J. Wilmot says when the case came before the Lords Commissioners: "There is no pretense that Green's brother. or his wife, was party to any imposition, or had any due or undue influence over the plaintiffs, but does it follow from thence that they must keep the money? No. Whoever receives it must take it tainted and infected with the undue influence and imposition of the person procuring the gift: his partitioning and cantoning it out amongst his relations and friends, will not purify the gift, and protect it against the equity of the person imposed on. Let the hand receiving it, be ever so chaste, yet if it comes through a corrupt channel, the obligation of restitution will follow it." In *Whelan v. Whelan*, (3 Cowen 578,) in the Court of Errors in New York, Judge Woodworth observes in regard to this principle: "It is believed that this rule is

firmly established. If it were otherwise, that a person could evade the principle by giving interests to third persons, instead of reserving them to himself, it would be almost impossible ever to reach a case of fraud." And this is the American, as well as English doctrine, and the doctrine of this court, in *Yosti v. Laughran*, 49 Mo. 599. We think it unnecessary to comment on the use of the word "voluntarily" in the letters of T. R. Patton and Marcus Patton, and in the reported speeches of the plaintiff to her aunts, when the deed was handed to them. Its frequent repetition does not tend to change the conclusion we have reached.

That conclusion is, that this deed of 1866 was not a spontaneous act; that it arose from the suggestions of others; that it was pressed upon plaintiff as a moral obligation; that this pressure came from one who had an authoritative control over her; that no motive of affection or gratitude prompted it; that her signature to the deed was the result of an habitual deference to the opinion of her uncle, and was no intelligent judgment of her own, and that the donees occupy no better position than their brother, through whose influence, mainly, the deed was procured. We are, therefore, of the opinion that the deed of 1866 should be set aside.

In regard to the deed of Campbell, Exr. to T. R. Patton, of 1867, it is clear that the defendant, Patton, is chargeable as trustee, so far as the interests of plaintiff are concerned. But there is nothing in the record to show what disposition, if any, the defendant, Patton, has made of these lots. It may be that *bona fide* purchasers have intervened, or that improvements have been made. We, therefore, reverse the judgment of the circuit court, and remand the case with directions to that court to proceed in conformity to this opinion.

Judges SHERWOOD and HOUGH concur. Judges NORTON and HENRY were not on the bench when the case was argued and submitted.                          REVERSED.