## FORD v. HENNESSY *et al., Appellants.*

1. **Gift by one in Extremis to Attending Priest:** PRIEST'S DUTY TO FAMILY OF DONOR. One F, a few days before his death, made a gift of all his money and executed a will devising all his other property to one H, a Roman Catholic priest, who had for six years been his pastor and father confessor, and had attended nim constantly in that capacity during an illness of a year's duration which preceded his death. No relative of F was with him during all this time, and he had no advice from any source except as H gave. F lived as a single man and sometimes, though not always, represented himself to be such, but H had heard a rumor that he had a wife in Ireland. He, however, made no inquiry to ascertain the fact, and never suggested to F that he ought to provide for her. H gave the money to the archbishop of the church, who gave it to a convent. In an action by the widow and child of F against H, the archbishop and the convent, to set aside the gift and recover the money; *Held*, that it was the duty of H, before accepting the gift, to have ascertained the fact as to F's reported marriage and satisfied himself either that F had no family or that he was determined to disregard his family ties and obligations, and as H had not done this, the gift could not stand. The fact that he had no selfish motive and received no personal benefit from the transaction did not relieve him of this duty.

2. **Undue Influence:** SUIT TO SET ASIDE GIFT: PARTIES PLAINTIFF: ADMINISTRATION. The heirs, and not the administrator, are the proper parties to a suit to set aside a gift made by the deceased

while *in extremis* as having been obtained of him by undue influence.

3. **Res Adjudicata.** A judgment against an executor in a suit wherein he sought to recover of one who, as legatee, was entitled to all the property of the decedent, certain money which he had obtained from the decedent by gift before his death, is no bar to an action by the heirs to set aside the gift as having been procured by undue influence. The questions involved are not the same.

4. **Undue Influence**: SUIT TO SET ASIDE GIFT: PARTIES DEFENDANT. One who without consideration receives the benefit of a gift obtained by another through undue influence, is liable to an action for restitution; but not one whose only connection with the transaction is that he received the property and delivered it to the ultimate beneficiary.

*Appeal from St. Louis Court of Appeals.*

REVERSED.

*Nathaniel Holmes* and *Alex. J. P. Garesche* for appellants.

1. The evidence does not show any persuasion or undue influence, nor any circumstances of imposition or fraud on the part of the donee to induce the gift; but on the contrary clearly and sufficiently explains and rebuts any *prima facie* presumption of fraud, imposition or undue influence arising from the mere fact of the relation of spiritual adviser. In such cases the authorities sustain the gift. *Garvin v. Williams*, 44 Mo. 465; *Huguenin v. Baseley*, 14 Ves. 273; *Archer v. Hudson*, 7 Beav. 551; *Hunter v. Atkins*, 3 Myl. & K. 113, *Brown v. Bulkley*, 1 McCarter (N. J.) Ch. 451; *Kirwan v. Cullen*, 4 Irish Chan. (N. S.) 322; *Crispell v. Dubois*, 4 Barb. 393; *Nesbit v. Lockman*, 34 N. Y. 167; *Greenfield's Estate*, 14 Pa. St. 489, 506; 1 Story Eq. Jur., §§ 311, 313; *Edwards v. Meyrick*, 2 Hare 60. To invalidate the gift there must be an abuse of confidence reposed. *Harvey v. Sullens*, 46 Mo. 147; *Cadwallader v. West*, 48 Mo. 483; *Baker v. Bradley*, 7 DeGex, M. & G. 597; *Hatch v. Hatch*, 9 Ves. 292; *Tingley v. Cowgill*, 48 Mo 297;

*Taylor v. Wilburn,* 20 Mo. 306. Besides the bare relation of spiritual adviser there must be evidence of circumstances going to show that dominion was acquired over the mind of the party and was abused. *Doggett v. Lane,* 12 Mo. 215; *Jenkins v. Pye,* 12 Pet. 253; *Dent v. Bennett,* 4 Myl. & Cr. 277; *Norton v. Relly,* 2 Eden 286; *Nottidge v. Prince,* 2 Giff. 246; *Boney v. Hollingsworth,* 23 Ala. 690, (a case of brother and sister;) *Crowe v. Peters,* 63 Mo. 429.

2. The record and judgment in the former suit are a bar to this action. *Cooley v. Warren,* 53 Mo. 169; *Union R. R. Co. v. Traube,* 59 Mo. 362; *King v. Chase,* 15 N. H. 9; 1 Greenleaf Ev., §§ 19, 522, 523, 528, 535, 536; Story Ev. Pl., §§ 780, 782; *Eastman v. Cooper,* 15 Pick. 276; *Livermore v. Herschell,* 3 Pick. 33; *Parrish v. Ferris,* 2 Black 606; *Pearce v. Gray,* 2 Yo. & Coll. 322; *Ramsey v. Herndon,* 1 McLean 450; *Morgan v. Thorne,* 9 Dowl. 228; *Spradling v. Conway,* 51 Mo. 51; *McNamee v. Moreland,* 26 Iowa 113; *Valentine v. Farnsworth,* 21 Pick. 182; *Nichols v. Day,* 32 N. H. 140; *Castle v. Noyes,* 14 N. Y. 331; *Strong v. Phœnix Ins. Co.,* 62 Mo. 289; *Wood v. Ensel,* 63 Mo. 194; *Manly v. Kidd,* 33 Miss. 141.. The testimony of Judge Madill was to contradict the record and was inadmissible. *Ramsey v. Herndon,* 1 McLean 450; *Lathrop v. Stewart,* 6 McLean 630; *Sheldon v. Newton,* 3 Ohio St. 494; *Carlton v. Patterson,* 29 N. H. 589; *Federal Hill S. F. Co. v. Mariner,* 15 Md. 230; *Hubbard v. Fisher,* 25 Vt. 542; *Lutes v. Alpaugh,* 23 N. J. L. 167; *Witt v. Russey,* 10 Humph. 208; *Campbell v. Butts,* 3 N. Y. 176; *Green v. Clark,* 5 Denio 505.

*J. H. Wieting* and *George M. Stewart* for respondents.

1. The widow and child are proper parties to bring the suit. *Sanders v. Druce,* 3 Drewry 140; *Staton v. Carron Co.,* 18 Beav. 156; Story's Eq. Plead., § 170; 2 Lomax on Executors, 514; 2 Williams on Executors, 1730; *Hagan v. Walker,* 14 How. 34; *Law v. Law,* 2 Collyer 41; *Consett v. Bell,* 1 Yo. & Coll. Ch. 569; *Travis v. Milne,* 9 Hare 141;

*Burroughs v. Elton*, 11 Ves. 29; *Samuel v. Marshall*, 3 Leigh (Va.) 567; *Hansford v. Elliott*, 9 Leigh (Va.) 95; *Thomas v. White*, 3 Littell (Ky.) 180; *Emmerson v. Staton*, 3 Monroe 118; *Phillips v. Threadgill*, 37 Ala. 93.

2. The judgment of the circuit court in the case of *McGee v. Hennessy* is no bar to this action. It was not on the merits. *Taylor v. Larkin*, 12 Mo. 103; *Spradling v. Conway*, 51 Mo. 51; *Hickerson v. Mexico*, 58 Mo. 61; and was proper to show this by the testimony of Judge Madill. *Perkins v. Parker*, 10 Allen 22; *Gray v. Dougherty*, 25 Cal. 266; *Dunlap v. Glidden*, 34 Me. 517; *Burlen v. Shannon*, 14 Gray 433; s. c, 99 Mass. 200; *Foster v. Busteed*, 100 Mass. 411; *Griffin v. Seymour*, 15 Iowa 30; *Packet Co. v. Sickles*, 5 Wall. 592; *Birckhead v. Brown*, 5 Sandf. (N. Y.) 151; *Hood v. Hood*, 110 Mass. 463; *Follansbee v. Walker*, 74 Pa. St. 306.

3. Father Hennessy held such a relation to Ford as to raise the legal presumption that the donation was the result of undue influence, and there is no evidence to rebut this presumption. *Thompson v. Hefferman*, 4 Drury & Warren 291; *Nottidge v. Prince*, 2 Giff. 246, 270; *Dent v. Bennett*, 7 Simons 546. The presumption is stronger in the case of a minister of religion than in that of guardian or attorney. Adams Equity, p. *184; *Norton v. Relly*, 2 Eden 286; *Hugenin v. Baseley*, 14 Ves. 273; *Hoghton v. Hoghton*, 15 Beav. 299; *Nachtrieb v. Harmony Settlement*, 3 Wall. Jr. 66; *In re Welsh*, 1 Red. Sur. Rep. (N. Y.) 238, (printed in Redfield's American will cases, p. 506). In any event, the party taking the gift must prove three things at least: 1. That donor had independent, disinterested advice as to the propriety of the gift. 2. That his mind was free from control of the party procuring the gift. 3. That the transaction was a righteous and reasonable one. Bispham's Eq., § 237. In the case at bar none of these conditions are satisfied. *Taylor v. Wilburn*, 20 Mo. 306; *Garvin v. Williams*, 44 Mo. 465; *Garvin v. Williams*, 50 Mo. 206; *Harvey v. Sullens*, 46 Mo. 147; *Cadwallader v. West*, 48 Mo. 483;

*Yosti v. Laughran*, 49 Mo. 598; *Ranken v. Patton*, 65 Mo. 378; *Meek v. Perry*, 36 Miss. 300; *Breed v. Pratt*, 18 Pick. 115; *Hatch v. Hatch*, 9 Ves. 297; *Turner v. Collins*, 7 Ch. App. 340.

4.    The Convent of the Good Shepherd, through Bishop Kenrick, who testifies that he acted merely as their agent, received the money impressed with the trust by which it was bound in the hands of the original donee. They are mere volunteers, to whom the fund was passed over intact, and without consideration. 1. Such a fund can be followed as long as its identity can be traced.  Hill on Trustees, note 1, p. *164; Perry on Trusts, 835, 840. 2. A volunteer can derive no benefit under the legal fraud of another.  Hill on Trustees, p. *172; *Yosti v. Laughran*, 49 Mo. 599; *Ranken v. Patton*, 65 Mo. 378.

NAPTON, J.—This was a bill in equity, brought by the wife of Patrick Ford, and his son, to recover a sum of money which Patrick Ford gave to Hennessy a few days before his death, and which was by Hennessy, under directions of Archbishop Kenrick, paid over to the Convent of the Good Shepherd . Hennessy and Archbishop Kenrick, and the Convent, and McGee, administrator of Ford, are made parties defendant.    There seems to be no dispute that the plaintiffs are the wife and son of Patrick Ford. A few days before his death, Patrick Ford gave to Father Hennessy a check for $4,243.65 on the Buchanan Bank of St. Joseph, and the only question in the case is, whether such a donation can be sustained, as Hennessy was his spiritual adviser at the time.    The charges in the bill are, that this influence was improperly exercised, which is denied.    That Patrick Ford was a Catholic, and that Father Hennessy was his spiritual adviser, is not denied, but it is asserted that Ford was intellectually competent to do what he pleased, and therefore, that this donation *inter vivos* was good.    There seems to be no material discrepancy in the evidence in regard to the facts.    Ford was a young Irish-

man, representing himself to be unmarried, and was a Catholic when he came to St. Joseph, in 1860. The Rev. John Hennessy was the pastor of St. Joseph Catholic church, and Ford was a member. Ford had accumulated some money and other property before his death. To some people he represented that he was married, and to others he said nothing, or contradicted this report. He was in delicate health, in fact, consumptive, and the property now sued for was given to Father Hennessy eight days before his death. At the same time he made a will, giving all his property to Father Hennessy. The petition of Ford's wife and child is to set aside the gift.

The testimony of Father Hennessy is the only important evidence in the case, and, I therefore copy it entire: I resided in St. Joseph, Mo., from the latter part of 1860 to the latter part of 1866; I knew Patrick Ford from the time of my arrival there, in 1860, until his death; know that Ford made a will, but cannot state how long that was before his death; my impression is that the will was drawn by P. L. McLaughlin, of St. Joseph. *Question.* State if you knew whether Ford was a married man at the time of the execution of his will? *Answer.* A rumor to the effect that he had left a wife in Ireland reached me, perhaps before his illness. I don't remember to have had any better knowledge of his marriage. I don't remember any question being raised at the time of his making the will, as to his being a married or unmarried man. I am unable to state when my knowledge of Ford being a married man became definite, prior to hearing of this suit; I cannot remember any source of information that would give me definite knowledge of the fact of marriage at the time of the making of the will. I received from said estate what is called an evidence of money, I suppose, a certificate of deposit, but the exact sum I cannot say; I think it was over $4,000; I gave it to Archbishop Kenrick, of St. Louis, about November or December, 1866; at the time of my giving the money to Kenrick, I do not remember to have

had any definite information that Ford had a wife and child alive.

Being cross-examined, this witness further says: While at St. Joseph, I was pastor of St. Joseph Catholic church, and Patrick Ford was a member of my congregation; can't give the date of Ford's death; the nature of his illness was consumption; I suppose he was complaining before he was confined to his bed; he may have been confined to his room or bed for two or three months before his death; he was confined to his room when his will was made; I may have recommended to him during my administrations at his bed-side, to arrange his affairs; I think I did; I suppose he made his will and his disposition of property in view of his then imminent danger of death. P. L. McLaughlin, who drew the will, was a respectable gentleman, member of the Catholic church, residing in St. Joseph; I think I asked him to draft the will; I partially knew at that time what the terms of the will were to be. Ford had given me a portion of the property, the amount of the certificate before alluded to, and it may be, and is likely that I did know that he was to convey more of his property to me; I don't remember that I had this information from any other source than Ford himself; I attended Ford in his last sickness as his spiritual adviser; I administered to him the sacrament of penance, gave him the communion and anointed him, the usual rites of the church, with those in danger of death by sickness. Do not remember that Ford stated to me the amount of his property; he may have stated that he had other property besides the certificate of deposit; the latter was indorsed to me either before or at the time the will was drawn. None of Ford's relations, so far as I know, were with him in his last illness; he had no independent legal advice as to the disposition of his property, so far as I know; I do not remember to have seen the certificate from a priest in Ireland certifying to the marriage of deceased to Margaret Ford, one of the plaintiffs. I knew Michael McGoe; it is likely that I told him that

Ford had given me this certificate of deposit; if I did tell him, it was before the will was drawn; I think he was present at that time; I don't think McGee ever demanded this money from me, or set up any claim to it, as executor of Ford. When Ford gave me this certificate, I think I asked him what disposition I should make of it, and that his answer was that I should do with it as I pleased: I cannot say that it was expressly or impliedly understood that it was to be used for the benefit of the church of which he was a member; I cannot remember that McGee ever objected to my retention of the proceeds of this certificate of deposit. I do not know that Mrs. Ford, one of the plaintiffs, has, on proper proceedings in court in Buchanan county, secured an allowance of dower in a portion of the real estate of Patrick Ford. Can't say when I first heard the rumor of Ford's marriage; don't remember that I ever talked with Ford on the subject, or that I ever took any steps to investigate the truth of the rumor. At the time Ford gave me this money, I think his mental condition was good; his physical condition then was that of a man far advanced in consumption; he was an intelligent man of the laboring class but not an educated man.

Father Hennessy received the certificate of deposit, had the sum of money entered in his own name, and after the death of Ford sent it to Archbishop Kenrick, who handed it over to the convent of the Good Shepherd.

The decisions of this court have been quite uniform in requiring donations of this character to be explained by the donee. The evidence of Father Hennessy is not very explicit. He had heard of Ford's marriage, but had never investigated the subject, nor did he ask Ford on his dying bed about it. We cannot assume to say what was the duty of a catholic priest under the circumstances. We can only recognize the duties of an ordinary friendly adviser. We presume that the ecclesiastical character does not divest a man of these natural impulses. When a man is about to die

1. GIFT BY ONE IN
EXTREMIS TO AT-
TENDING PRIEST:
priest's duty to
family of donor.

and proposes to leave his entire estate to a stranger, it would seem to be natural to inquire whether he has a family. If he negatives such inquiries, or if he admits the fact, but says he has determined to disregard such connections, there is an end to the matter. He has a right to do with his property as he pleases. Had Father Hennessy never heard of Ford's marriage, we could readily understand his silence on the subject, but as he admits that he had heard such a report, it seems strange that he neither investigated it nor made any inquiries about it when called to the bed-side of the dying man. He made arrangements for a will, the contents of which he was apprised of, and he received a donation of $4,000 and upwards, without inquiries.

Let us compare this testimony of Father Hennessy with that of the Jesuit Confessor of Miss Kirwan, in the case of *Kirwan v. Cullen*, to which we have been specially referred by the counsel for the defendant in this case. Mr. Ryan, the confessor, made an affidavit (4 Irish Ch. (N. S.) 326) in which he admitted that he was Miss Kirwan's confessor, and that he had been the person who communicated to Dr. Curtis Miss Kirwan's wish to transfer the fund. He stated that he believed that before such communication he was the only person acquainted with Miss Kirwan's wish to transfer such fund. He denied that she was at all guided in the disposition of her property by him as her spiritual director or confessor, or that the transfer was obtained or induced by any undue means or spiritual influence used or practiced towards or over Miss Kirwan by him or by any other person, as he believed, and further denied that he or any agent of his, or any one under his authority or control, exercised any spiritual authority or power over her to induce or obtain the transfer. He denied all the allegations of spiritual influence in the petition. He stated that the lady was of a charitable and pious disposition, and frequently expressed her wish to dispose of a portion of her property for charitable or religious purposes, and amongst

others, she expressed a desire to benefit the said community (Nuns in the city of Dublin) which she had often visited. He further stated, that upon one occasion, she, without any advise or suggestion, in conversation expressed her wish that he would accept a transfer of £3,000 for them, that he declined to accept the transfer, and advised her to consult the members of her family, especially her brothers, and also suggested that she should have some legal advisers, and that she refused to accept such advice, stating that her family should not know anything about it until after her decease, that her sisters were independent, and that she was determined to bequeath all her property for charitable purposes. Mr. Ryan then alleged that he suggested Dr. Curtis as a trustee.

The Lord Chancellor observes on this: "There is then the affidavit of a gentleman who intervened in the transaction, at least so far as procuring the assent of the trustees. He was also in the position of a person not taking any personal benefit from the transaction, beyond procuring these persons to act as trustees. His statement is not in any way controverted, and his evidence is so full, clear and creditable to him, that though on the whole it may not be absolutely necessary, I shall read some portions of it." The Lord Chancellor concludes: "I do not think it possible to contend that this case can be classed with the cases in which donations and gifts have been held by this court to have been tainted by the fact that they were made to a person who was placed in a situation giving him power to exercise undue influence over the donor." Miss Kirwan was a lady of mature years, and adequate means, living with her brothers and sisters, who were also of adequate means, and was advised by her father confessor to consult them and also to call on a legal adviser, but she declined following his advise, and stated her determination to appropriate £3,000 to a convent of nuns in Dublin, and desired her confessor to act as trustee in the matter, which he positively declined. Upon communicating her inten-

tions to the Archbishop, he and Dr. Curtis consented to act as trustees, and Miss Kirwan lived more than a year after this donation, and frequently visited the nuns to whom it was made. All spiritual influence is not merely denied, but disproved.

In the case we have before us, Ford was a young Irishman who had been living in St. Joseph for five or six years, and had occasionally represented himself as married, and occasionally denied it. Father Hennessy was his confessor. Of course he, like all intelligent gentlemen, whether priest or layman, was aware of the duty which every one owes to his family. Whether Ford had a family or not, was a matter which Father Hennessy never ascertained, though he could have readily done so. He neither asked Ford or any one else about the subject. When Ford proposed to give him $4,000 and upwards, and also to execute a will leaving everything he had to him, no inquiries were made in regard to the obligation which no religious creed dispenses with. It is said, however, that Ford was perfectly aware of the existence of a wife and child, and, therefore, Father Hennessy was under no obligation to recall this to his mind or memory. The confidential relations which are supposed to exist between a spiritual adviser and his advisee are assumed not to extend to any advice in regard to the moral or legal obligations of such parishioner, apart from the claims of the church.

The gift to Father Hennessy was an absolute one, accompanied with the declaration of Ford, upon inquiry, that he could do with it as he pleased. The will executed on the same day was more explicit and provides that all his property be left to Father Hennessy to promote the "interests of religion and the spiritual welfare" of the testator   It is said by Judge Story that "it is incumbent upon persons who receive benefits from those towards whom they stand in confidential relations, to show that such persons had competent and independent advice." 1 Story Eq. Jur. 312. Father Hennessy in this case received

no personal benefit, and therefore, it may be urged, was not bound to call in professional or disinterested advisers. This point was, however, considered by this court in *Yosti v. Laughran*, 49 Mo. 599, and more fully in *Ranken v. Patton*, 65 Mo. 378, where it was held that the principle could not be evaded by giving interests to third persons, instead of reserving them to the one who exercises the undue influence.

Lord Chancellor Sugden says, in *Thompson v. Heffernan*, 4 Drury & Warren 291: "When a clergyman attends upon a person in his last moments, and sets up a gift from the dying man to himself, the evidence of the transaction ought to be perfectly free from all suspicion, and such as to leave no reasonable doubt in the mind of the court as to its truth. A death bed is not the fit place, nor the proper time, at which a clergyman of any denomination should look to his own personal interest or seek to obtain the property of a dying man. On such an occasion, if a man has a testamentary intention and time allows, proper advice should be obtained, some professional person should be sent for and disinterested witnesses called in; all due solemnities should attend the disposition of the property; advantage should never be taken of a man's last moments in order to obtain disposition of his property, in favor of persons not connected with him by blood, and I shall always require strong evidence, more especially in the case of a clergyman, before I support a gift *in extremis*." I do not quote this opinion of Chancellor Sugden, as having any application to the facts of the present case, where Father Hennessy derived no pecuniary benefit from the gift, though made to him absolutely, and reported it the Archbishop, and was governed by his advice in its ultimate destination. The general principles he announces are, however, worthy of note. They are stated in more general terms by Sir S. Romilly, in *Hoghton v. Hoghton*, 15 Beav. 299: "In many cases, the court from the relations existing between the parties to the transaction, infers the prob-

ability of such undue influence having been exerted. These are the cases of guardian and ward, of solicitor and client, spiritual instructor and pupil, medical adviser and patient, and the like; and in such cases the court watches the whole transaction with great jealousy, not merely for the purpose of ascertaining that the person likely to be so influenced fully understood the act he was performing, but also for the purpose of ascertaining that his consent to perform that act was not obtained by reason of the influence possessed by the person receiving the benefit; not that the influence itself flowing from such relations is either blamed or discountenanced by the court; on the contrary, the due exercise of it is considered useful and advantageous to society; but this court holds, as an inseparable condition, that this influence should be exerted for the benefit of the person subject to it, and not for the advantage of the person possessing it."

Father Hennessy was the spiritual adviser of Ford for six years, and during all these years never asked him about his marriage in Ireland, though he had heard a report of such marriage. Ford was confined to his house for twelve months before his death and to his room for several months, during which he was frequently visited by his father confessor. Finally, eight days before he died, he proposed to give this confessor $4,000, and also to make his will, leaving to him his whole estate, in the "interest of religion," and for "his spiritual welfare." No inquiries were made in regard to his wife and child. We see that Father Hennessy had no selfish motive in what he did; we see that he only looked to the interest of the church of which he was a minister, and has since become a Bishop, but we cannot overlook the rights of a wife and child, which our laws regard as superior to any merely religious obligations, where either has to be neglected, or rather as a predominant duty inculcated by religion, and one of its most important requisitions. We therefore concur with the circuit

judge in holding that the gift to Father Hennessy should be annulled.

A question has been made in this case whether the wife and child of the deceased are proper parties to attack the gift to Father Hennessy, or whether the suit must not have been brought by the administrator. This same point substantially was made before the Lord Chancellor, in *Law v. Law*, 11 Jurist 463. The Lord Chancellor observed in that case, in regard to the objection which had been raised in regard parties, that the ground for making the persons in question parties to the suit, was, that it appeared from the facts stated that the executors of R. Law were precluded from suing these persons, in respect to their liabilities to R. Law's estate: "This brings the case within the ordinary rule as to parties, the facts being, that the executors of R. Law, on their own account, purchased two-thirds of the partnership from the other partners, and this transaction has received the sanction of the court. The executors of R. Law are therefore,. no longer in a situation to litigate in respect of this matter with those with whom they have so dealt, whatever rights may be still existing in the legatees. The case then falls within the rule, which entitles parties interested in an estate, to bring before the court the representatives of the estate, and those who have duties to perform in reference to it cannot be sued by those who legally represent it." The decision of the St. Louis circuit court in *McGee v. Hennessy, et al.* was based upon the ground, that the executor could not maintain a suit to recover money from Hennessy, to whom the will gave everything. This suit in equity, however, is not based on the title derived from the will, but on a title under the statute laws of Missouri.

That the judgment in that case, not involving the same questions at all, was no bar to this case appears from the testimony of Judge Madill, who was on the bench at the time and delivered the opinion of the

2 UNDUE INFLU- ENCE: suit to set aside gift: parties plaintiff: administration.

3. RES ADJUDICATA.

38—70

court.    See also *Hickerson v. City of Mexico*, 58 Mo. 61.    It may be added that the testimony of McGee in this case, shows clearly that the suit originally brought in his name, was not by his consent, and that he sought to have it dismissed.

The House of the Good Shepherd being the donee or voluntary grantee of the fund obtained from Ford, is liable

4. UNDUE INFLU-
ENCE: suit to set
aside gift: parties
defendant.

in this suit, under the rule laid down in the case of *Ranken v. Patton*, 65 Mo. 378.    We see no ground for the judgment against Archbishop Kenrick, as he had nothing to do with the transaction except to hand the fund over to the House of the Good Shepherd.    We therefore reverse the judgment and remand the cause to the circuit court, with directions to enter up a judgment in conformity with this opinion against Father Hennessy and the House of the Good Shepherd. The other judges concur, except Judge HENRY, who dissents.