McKinney et al., Appellants, v. Hensley

**Conveyance from Parent to Child:** EVIDENCE REQUIRED TO SET ASIDE. In a suit to set aside a deed from a father to his son, it appeared that the father was about seventy years of age when he executed the deed, and shortly before executing it had been stricken with a paralysis, which greatly impaired his powers both of body and mind, but it did not appear that he was incapable of contracting, or was unable to comprehend the nature of the business, or that there was any relation of trust or confidence other than that of parent and child, or that the son practiced any fraud, or exercised any undue influence, or took any advantage of his father's weak state of mind. *Held,* that the trial court properly refused to set the deed aside.

Cases relating to conveyances from child to parent, etc., distinguished.

*Appeal from Carroll Circuit Court.*—HON. E. J. BROADDUS, Judge.

AFFIRMED.

*Charles A. Winslow* and *J. L. Mirick* for appellants.

In the case at bar, we have the concurring elements of old age, physical and mental weakness and want of consideration, without any apparent reasons for the transaction, in connection with something stronger than mere suspicion that actual fraud and undue influence existed. All the cases agree that such a bargain cannot stand. *Freeland v. Eldridge,* 19 Mo. 325; *Cadwallader v. West,* 48 Mo. 483; *Perkins v. Scott,* 23 Iowa 237; *Seeley v. Price,* 14 Mich. 541; *Ellis v. Mathews,* 19 Texas 390; *Allore v. Jewell,* 94 U. S. 506; *Tracy v. Sackett,* 1 Ohio St. 54; *Walker v. Mc-Coy,* 3 Head (Tenn.) 103. Equity will not permit a party to take a conveyance for consideration, and thereafter set up the same conveyance as a gift. *Cadwallader v. West,* 48 Mo. 483; *Clarkson v. Hanway,* 2 P. Wms. 203; Kerr on Fraud and Mistake, p. 191. Whether viewed as contracts or gifts, the confidential relations existing between the

parties would render the deeds invalid independent of the other objections urged against them. " The natural relation of the parties was reversed in this instance by the influence of time. The parent had become a child, and the child was guardian to the parent." *Highberger v. Stiffler*, 21 Md. 353; *Yosti v. Laughran*, 49 Mo. 594; *McCormick v. Malin*, 5 Blackf. 523; *Beauland v. Bradley*, 2 Smale & G. 339; *Sanfley v. Jackson*, 16 Texas 584; *Millican v. Millican*, 24 Texas 426; *Bundy v. McKnight*, 48 Ind. 502; *Garvin v. Williams*, 44 Mo. 465; 50 Mo. 206; *Harvey v. Sullens*, 46 Mo. 147; 48 Mo. 483; *Street v. Goss*, 62 Mo. 226: *Rankin v. Patton*, 65 Mo. 378; *Bradshaw v. Yates*, 67 Mo. 2:1; *Ford v. Hennessy*, 70 Mo. 580; *McClure v. Lewis*, 72 Mo. 314; *Miller v. Simonds*, 72 Mo. 669. The only reasons offered to relieve this case from the effect of the confidential relations on the one hand, and the mental weakness and want of consideration on the other—each raising similar presumptions and calling for like explanations—are that Mr. Hensley possessed a limited amount of intelligence, and expressed satisfaction with what he had done. This falls far short of meeting the necessities of the case. The relation in one case, and the facts in the other, raise a presumption of undue influence and fraud, which puts upon the representatives of Joseph Hensley the burden of showing the exercise of the highest degree of good faith on his part, and that the transaction is in every particular worthy of receiving the sanction of a court of equity, and this, too, in the clearest and most satisfactory manner. 72 Mo. 314; 72 Mo. 669; 46 Mo. 147; 62 Mo. 226.

*Hale & Eads* and *M. C. Shewalter* for respondent.

Proof of old age and paralysis is not of itself sufficient to establish incapacity; there must be further proof that unsoundness of mind was the actual result. Did the paralysis extend to his mind? Did the capacity remain to see things in their true relation—to transact business like

that in question? Weakness of understanding, or intellectual capacity below the average of mankind, if there be no fraud, or no undue advantage be taken, is not of itself adequate ground to set aside a transaction. Kerr on Fraud, p. 146; *Young v. Stevens*, 48 N. H. 133; *s. c.*, 2 Am. Rep. 202; *Van Alst v. Hunter*, 5 Johns. Ch. 148; *Doggett v. Lane*, 12 Mo. 219; *Van Pelt v. Van Pelt*, 30 Barb. 134; *Ex parte Holyland*, 11 Ves. 11; *Jackson v. King*, 4 Cow. 217; *Dennett v. Dennett*, 44 N. H. 538.

NORTON, J.—This suit was instituted in the circuit court of Carroll county by the heirs of James Hensley, deceased, to set aside two deeds made by their ancestor to his son Foster Hensley, conveying to him certain land in said county. One of the deeds was dated 21st of September, 1874, and acknowledged the 24th of the same month; the other was dated the 22nd of December, 1875, and acknowledged the same day. The first was a deed of general warranty executed by said Hensley alone, the second was a quit-claim executed by said Hensley and also by his wife. Both of them conveyed the same land. The grounds alleged in the bill for vacating and setting aside these deeds are substantially that said James Hensley was at the time of their execution of unsound mind and wholly incompetent and unfit to manage his affairs; and that said deeds were obtained by fraud, misrepresentation, constraint and undue influence. These allegations of the petition were denied in the answer, and upon the trial of the cause, the court found the issues for defendant and entered judgment accordingly, and it is this finding and judgment we are asked to review on plaintiff's appeal therefrom.

While the evidence in the record shows that James Hensley, the grantor in these deeds, was about seventy years of age, and in the month of August, 1874, was stricken with paralysis which greatly impaired both his powers of mind and body, it falls short of showing that he was incapable of contracting or that he did not under-

stand and comprehend the nature of the business he was transacting. All the witnesses who spoke on that subject testified that prior to his attack of paralysis " his mind was good," that " he was a firm man," "with good business habits." Four of the plaintiffs testified in the case, all of whom concurred in the statement that after said attack said Hensley was not capable of transacting business.

Four other witnesses were examined on the part of plaintiffs; one of whom, John Calvert, testified that after said attack said Hensley appeared to be entirely helpless; his tongue was so paralyzed that he could not understand him; his wife interpreted for him; could not state the condition of his mind in August and September, 1874, because I could not understand him. His answers to my questions as uttered to me by his wife, were intelligent. When I first saw him in 1874, could tell nothing about his mental condition; after I could understand him, I never regarded him as insane; I only mean that his mind was weak     *     *     I never regarded his mind as unsound or insane.

Charles Kuhn, another of plaintiffs' witnesses, testified as follows : Have known Hensley since 1864. He was a fair business man before sickness; saw him first after his sickness in fall or winter of 1874; very difficult to understand him at that time. He had frequent crying spells when talking to me. I saw him five or six times during sickness; could not see any change in his mental condition. He would always cry when talking of his family. He would sometimes say he was dissatisfied with a part of his family, and say they had mistreated him, and then he would complain of others; sometimes complain of one and then another. I talked with him about our business. He talked intelligibly, and I thought he was hard on me; only cried when he talked of his family. I had two suits against him. He settled them with me through an agent, Mr. Darr. He talked intelligently about our business. I thought he was hard on me in the settlement.

Never saw any difference in his mental condition from the first time I saw him (after his sickness) until the last. I did not see anything in the settlement that indicated weakness of mind.

K. Rogers testified as follows: Have known Hensley since 1864; lived on his land a part of the time; since then have lived in DeWitt; knew Hensley well all the time before sickness; his mind was good; regarded him as a firm man; did not see him until the election in November, 1874, after his sickness; talked with him on that day in Hanmer's drug-store some three-quarters of an hour. He was very weak in body and mind. He had been hauled in to vote, and had to be helped out of the conveyance; his conversation was very indistinct, and one had to be very particular to understand him. I considered his conversation very broken; when he talked about things in the past it was connected, when of recent events it was broken. Don't think any one was present when I conversed with him. I think his talk was to some extent unintelligible. He spoke of being an old fool for coming out to the election; and said some persons were stealing his timber; others would pay for more than they got, and some would not pay anything at all.

Mr. Williams, another witness for plaintiffs, testified that he had known Hensley for twenty-one years. Did not see him for a year after his sickness; his speech then was bad; had to have an interpreter. He could scarcely get about. I don't think his mind was in a condition to attend to business. I would not have bought land of him. On cross-examination witness stated that he saw Hensley at the election and attending to a lawsuit. Hensley said he desired to be excluded from the church, his wife having been turned out; saw no evidence of insanity; his conversation about the church matter was sensible.

On the other hand defendant introduced ten or eleven witnesses, among whom was Dr. Logan, who had been Hensley's family physician for thirty years, and attended

him when stricken with paralysis in August, 1874. He testified that he could not at first understand what Hensley said; he made his wants known by signs; in four or five weeks his physical condition was improved so he could get about. He believed his mind was right; in the incipiency of the attack it was weak, but began to improve. He thought his mental condition was good; had frequent conversations with him on business. He said he understood his business better than any other man could be made to understand it. Dr. Craig, another physician, testified that he saw Hensley in the fall of 1874, at DeWitt, and that his mind was all right; saw him in May, 1876; his general health had improved; went to his house to bleed him; could not see that his mind had been affected with disease.

Eight other witnesses were introduced on the part of defendant, all of whom testified that while, after the attack of paralysis, Hensley was weaker in body and mind than before, he was, nevertheless, capable of transacting business. Among the witnesses introduced was the assessor of the county, who testified that he saw him two months after he was paralyzed, and that he gave in his list of property with as much intelligence as usual; gave the numbers of his land without referring to his deeds; said that one half acre had been taken from the tract given to Foster; saw him next when he bought some boards of him, which he sold at the usual price; thought his mind was sound up to the time of his death; that he could not understand him without the help of his wife, who interpreted for him. Another witness testified that he was at Hensley's house in August, 1875. There was considerable conversation about a suit; that he seemed to understand all about the suit, and knew exactly what he was talking about; that he afterward sent for witness to do some surveying for him in the fall; gave instructions about the matter, and told me that at a certain place there were two surveys. He told me more about the land than most men could do; exam-

ined his deeds to see if he was correct; found he was well posted and correct in his statements. His body was weak and he seemed to be somewhat childish. Another witness testified that he wrote a will for said Hensley in February, 1875; that he talked rationally and sensibly. In giving his directions about writing the will, he talked freely about what he had done for his children; gave the numbers of his land; told me what to write and did it intelligently. The evidence of the other witnesses introduced by defendant is to the same effect as the above, and we think the evidence clearly preponderates on defendant's side of the issue as to whether said Hensley, at the time of the execution of the deeds sought to be vacated, had legal capacity to contract, and fully justified the trial court in finding the issue for the defendant.

There was no evidence tending to show any relation of trust or confidence between said Hensley and defendant, except that which exists between parent and child, and such relation is not sufficient to justify a deed or conveyance from father to son being vacated and set aside without showing the exercise of some undue influence or the existence of fraud, or that some advantage had been taken by the son of the father's weak condition of mind. The cases of *Garvin's Adm'r v. Williams*, 44 Mo. 465; *Ford v. Hennessy*, 70 Mo. 580; *Bradshaw v. Yates*, 67 Mo. 221, and that class of cases to which we have been cited by counsel, are only applicable to gifts, grants or donations obtained by attorney from client, spiritual advisor from advisee, trustee from *cestui que trust*, parent from child, guardian from ward, and that class of transactions. They do not apply to cases of gifts, grants or donations from parent to child.

It appears from the evidence that the grantor instituted suit to amend the deed made by him dated September, 1874. This suit was compromised and dismissed in December, 1875, when the second deed was executed, Foster Hensley paying the costs of the suit, the attorney's fee and $250

at his father's suggestion for the dower of his mother. We think the evidence wholly fails to show that in the procurement of these deeds Foster Hensley practiced fraud upon or exercised undue influence over his father. Judgment affirmed, in which all the judges concur.

*Motion for Rehearing Overruled.*