McKissock et al., Appellants, v. Groom et al.

### Division Two, March 7, 1899.

1. **Conveyance**: LACK OF CONSIDERATION: UNDUE INFLUENCE: THINGS CONSIDERED.  In passing upon the question that undue influence was used upon the grantor by the grantees in a deed sought to be set aside, the relation of the parties, the mental condition of the grantor, and the character of the transaction should all be taken into consideration.

2. ———: ———: ———: WHEN FRAUDULENT.  The undue influence that a child may have over a parent, due to the mere love and affection that the parent has for the child, will not alone justify the setting aside of the parent's deed to the child, however unfair or unjust it may be to others.  Such influence is not unlawful and fraudulent.  But in order that it may be set aside on the ground of undue influence the undue influence must not only be shown, but also that it was exercised in the procurement of the execution of the instrument.

3. ———: ———: ———: ———: CASE STATED.  It is held in this case that there was an entire failure of evidence that the grantees secured the deeds from their father by undue influence.

4. ———: INCAPACITY. The legal test of the capacity of the grantor to make a deed is his capacity to understand the nature and effect of the transaction. And measured by this test, it is held that the evidence in this case shows the grantor had beyond any doubt sufficient capacity to make the deed in question.

*Appeal from Moniteau Circuit Court.*—HON. D. W. SHACKLEFORD, Judge.

AFFIRMED.

EDMUND BURKE and JOHN COSGROVE for appellants.

(1) The mental faculties of William B. Groom were very much impaired. He was subject to the influence of the defendants and their wives, who did not permit him to escape their watchful attention. His free agency was destroyed, and the wishes of defendants were substituted for the will of their father. The influence exercised by defendants over their aged father, mentally and physically infirm, constituted such control as to make their acts, in the circumstances of the case, contrary to law, and the deed voidable at the suit of the children. Dingman v. Romine, 141 Mo. 466. (2) The property of William B. Groom was not divided equally among his children and grandson. The evidence strongly tends to establish his want of capacity to make a valid contract. The opportunity the defendants had to exert their influence over him, the jealous care they manifested to be present whenever either of the girls were with the father, his advanced years and his physical and mental infirmities bring this case within the principles announced in Hamilton v. Armstrong, 120 Mo. 597, and Martin v. Baker, 135 Mo. 495. (3) It requires greater mental capacity to make a deed than a will. Martin v. Baker, 135 Mo. 495; Kerr v. Lunsford, 31 W. Va. 680; Jarrett v. Jarrett, 11 W. Va. 534; 25 Am. and Eng. Ency. of Law, 937; Jackson v. Harding, 83 Mo. 175. (4) It needs no argument to show that it

takes less persuasion or coercion to overcome a weak mind than it does a strong one. Meyers v. Hanger, 98 Mo. 438. (5) The relationship sustained by defendants to their father, his mental and physical conditions the day before and the day after the execution of the deed to the defendant, Valentine Groom, raised the presumption of undue influence and placed the burden of proof upon defendants that William B. Groom was of unsound mind when he executed the deed to his sons. Dingman v. Romine, 141 Mo. 466. (6) The first agreement dated September 25, 1893, the same date as the deeds, shows that defendants were to pay Mrs. Leslie, Mrs. McKissock and Mrs. Seibert and W. R. George $500 each; in all $2,000. The consideration in the deed to Valentine was. $2,000, and in the deed to Thomas M. $2,800; and in the language of the contract, "it being understood and agreed between the parties hereto that said sum shall be paid in lieu of charging said first parties with the value of said lands as. advancements." Mr. Wood, in his evidence, varied the meaning of the language of the contract above quoted, by attempting to explain that the defendants were only to pay $2,000, and not $4,800 as expressed in the deeds. This difference only strengthens the plaintiff's contention that the old gentleman was a mere puppet in the hands of the defendants. The plaintiffs objected to Mr. Wood's evidence as its tendency was to change the terms of the written contract. The trial court overruled this objection. This was error. Pugh v. Ayers, 47 Mo. App. 590; Callaway v. Henderson, 130 Mo. 77; Lumber Co. v. Warner, 93 Mo. 374; Tracy v. Union Iron Wks. Co., 104 Mo. 193.

L. F. WOOD and W. M. WILLIAMS for respondents.

(1) This case depends upon the weight and effect that should be given to the evidence. The trial judge had the benefit of the personal presence of the witnesses before him. He observed their conduct upon the stand, saw the parties and

heard their statements and gave judgment for the defendants. Even in chancery proceedings this court will defer largely to the findings of facts by the trial court. Swon v. Stephens, 143 Mo. 384; Mathias v. Oneal, 94 Mo. 530. (2) The evidence does not show that any influence was exercised by the defendants over William B. Groom, by which he was induced to execute the conveyances sought to be set aside. The influence, to invalidate a will [or deed] on the ground of undue influence, must be such as amounts to moral coercion. Norton v. Paxton, 110 Mo. 456; Teagarden v. Lewis, 44 N. E. Rep. 9; Carl v. Gabel, 120 Mo. 296. (3) The mere fact that the mind of a person is impaired by age or disease does not render such person incompetent to make a valid contract. The legal test is the capacity to understand the nature and effect of the transaction. Cutler v. Zollinger, 117 Mo. 92; Likins v. Likins, 122 Mo. 279; Richardson v. Smart, 65 Mo. App. 14. (4) The facts that the father had confidence in his children, and intrusted them in the management of his estate in his old age, without some proof that the relation had been abused; and that they had influence over him without proving that it had been exercised, offers no reason for defeating his will [or deed] on the ground of undue influence. Cash v. Lust, 142 Mo. 630. (5) The testimony of the disinterested witnesses clearly preponderates in favor of the defendants. It shows not only that Mr. Groom fully understood what he was doing, but that he acted upon his own judgment, and gave directions to the parties who prepared the papers, fully informing them of his desires and what he wanted done. The evidence of the plaintiffs themselves is certainly very weak upon the question of his incapacity. They accepted money from him, and some of them transacted other business with him, after he made the deeds.

BURGESS, J.— This is a suit by the daughters and grandson of William B. Groom, deceased, against his two

surviving sons, Valentine Groom and Thomas M. Groom, to set aside and cancel certain deeds executed by their father to them, by which he conveyed to them all of his land.   The grounds upon which the deeds are sought to be set aside are the want of mental capacity upon the part of William B. Groom to make the deeds, and that they were obtained by undue influence on the part of the defendants.

On August 21, 1893, William B. Groom had a stroke of paralysis in consequence of which he was helpless and unable to talk for some time thereafter.   His physician testified that he "was suffering from incomplete paralysis, not able to speak, but could probably recognize"; that in his opinion it "did not affect the intellectual part of his brain; that it was Bell paralysis and implicated the fifth pair of nerves which supplied the voice; that this condition was the same on the twenty-third of August, and much improved on the eleventh of September, and his mind was all right."   The deeds in question were executed on the twenty-fifth day of September, 1893.   They were prepared by Mr. L. F. Wood, an attorney, and by the clerk of the circuit court of the county, Mr. O. M. Taylor, who went to the home of the grantor six miles in the country, at his request, conveyed by one of the defendants, to prepare them. They had been sent for by him for the same purpose a short time before, but were unable to go, and when they did go they found him in bed, but able to transact business.   Then after a general conversation in which he engaged, he informed them that he had sent for them to prepare deeds dividing his land between his sons, whom he told to get his deeds.

He informed Wood and Taylor what he wanted done, and gave them the metes and bounds of the tracts that he wanted to convey to his sons respectively, and said that he would require his boys to pay to each of his daughters and grandson, $500, making $2,000 in all.   He did not want to divide the land equally, as he had theretofore deeded eighty

acres to Valentine. He had given the girls some money, and said he intended to give them $500, and expected the boys to give them $500 more, making $1,000 apiece for the girls, besides some other property. He named the consideration in Valentine's deed at $2,000, and Tom's, he having received no land, at $800 more. He designated the land conveyed to each one of the boys without suggestion from anybody. Defendants were present at the time and something was said about the amounts due the girls, and their father replied that he meant for each of the girls and his grandson to receive $500. He wished to keep control of things as long as he lived, and wanted this understanding reduced to writing. He was then about eighty years of age. The land conveyed to these defendants on September 25, 1893, and eighty acres theretofore conveyed to Valentine by his father, was, at the time of the trial of this case in the court below, of the estimated value of $12,000 or $14,000. Valentine was the oldest son. When he married he moved upon the eighty acre tract given to him by his father. Thomas was the youngest child, and lived with his father until the latter's death, which occurred May 14, 1894. He married September 13, 1893, and took his wife home. At that time his father was unable to sit up, or help himself and had to be fed with a spoon like a child. His mind was weak and at times he did not recognize members of his own family. Instead of signing his name to the deeds, he was too nervous and weak to do so, and made his mark.

William B. Groom was an affectionate father, and it was in evidence that he had said that he intended to divide his property equally among his children and grandson. His daughters all married and left home between the ages of eighteen and twenty-one, and after they learned that he had conveyed his land to the defendants one of them told him that they were dissatisfied, when he seemed very much hurt and cried. He, however, told Buford Bybee, an intimate friend,

that his reason for dividing the land between the boys was, that they had worked it and improved it and had helped to care for him and his wife, and he did not think it right to give their work to the girls. This witness also stated that his mind was then unimpaired. About December 1, after the deeds were made, he was in the town of California in said county, and in a conversation with O. M. Taylor, clerk of the circuit court, he asked if the parties had been inquiring about the deeds, and being informed that they had, he replied that he could not help it if they were dissatisfied, that it was the way he wanted it. .

In April, 1894, he concluded to make a will and again sent for Taylor and Wood. Taylor at first declined to go on account of the dissatisfaction on the part of some of the children, but upon being urged to do so, consented. Taylor and Wood were at the house, and in his company at that time two or three hours. Taylor says that he thought Mr. Groom's mind was in good condition at that time. The will was drawn and duly witnessed on the twentieth of April, 1894. He referred in it to the deeds that he had made to his sons, and to the fact that, as a consideration for said conveyances, the boys were to pay $500 to each of the other heirs. He also specially directed that there should be included in the will a statement that he had always intended that the boys should have a larger amount of his estate than his daughters, and the will so declares. He, at that time, told Messrs. Wood and Taylor "that some of the children were not satisfied with the disposition he had made of his property," and he feared trouble; "that he wished to fix up matters as far as he could in his will," and asked them if he "could make any better paper." He discussed at that time the deeds and their terms.

The witnesses mainly relied upon to overthrow the deeds were Mrs. Leslie, Mrs. Seibert and Mrs. McKissock, Mr. George, father of plaintiff, W. R. George, and two or three others, nearly all of whom were in some manner connected

with the parties to the suit.    Not a witness for plaintiffs undertook to state the mental condition of the deceased at the time of the execution of the instruments.    They spoke about him at the time he was suffering from the stroke of paralysis. Some of them saw him two or three weeks before the deeds were made, and some of them after that time.    Several of the witnesss said that he, at a previous date, had said that he intended to divide his property equally among his children.

It was shown by the plaintiffs themselves that after he had made these deeds, he gave, in October, to each of them, $250 in cash.    They expressed the opinion that he knew what he was doing when he transacted this business with them and understood that he was giving them this money. They accepted the gifts and executed receipts therefor. Plaintiff William R. George had business dealings with him after the deeds were made, and said that he seemed to understand the transactions that took place between them.

Two of the plaintiffs, after they were informed of the execution of the deeds, received from the defendants the $500 which their father required should be paid to them as part of the consideration for the deeds.    They claim that this was accepted under a misapprehension and upon the representation that the others would likewise accept their part.

Groom, Sr., talked to Gotlieb Volkhardt about the matter after he had made the deeds.    He then seemed to be entirely rational and to understand what he was doing.    He told the witness that the boys would get the land and the girls the money, and after the division, he thought, when everything was sold, there would be $300 more. Defendants called a number of witnesses who had opportunity of conversing with the elder Groom, and observing his condition, and who testified that he was capable of understanding business transactions.

The court dismissed the bill and rendered judgment against plaintiffs for costs.    They appeal.

It is claimed by plaintiffs that the mental faculties of William B. Groom were very much impaired by old age, that he was subject to the influence of defendants and their wives; that his free agency was destroyed and the wishes of defendants substituted for his, and by the exercise of undue influence over him, he being mentally and physically infirm, they induced him to execute the deeds in question which plaintiffs have the right under such circumstances to have set aside as having been obtained through fraud and undue influence.

While there is nothing disclosed by the record in this case that takes it out of the general rule which places the burden upon him who makes an affirmative allegation of sustaining it by evidence (McKinney v. Hensley, 74 Mo. 326; Hatcher v. Hatcher, 139 Mo. 614), in passing upon the question of undue influence the relation of the parties, the mental condition of the grantor in the deeds sought to be set aside, and the character of the transaction will be taken into consideration. [Dingman v. Romine, 141 Mo. 466.]

But it must be borne in mind that the undue influence that a child may have over its parent through the mere love and affection that the parent has for it, will not justify the setting aside of a deed upon that ground alone, however unfair or unjust it may be to others, for such influence is not unlawful or fraudulent, but in order that it may be done it must be further shown that such influence was exercised in the procurement of the execution of the instrument.

"It must be an influence exerted *mala fide* to produce a result which the party, as a reasonable person, was bound to know was unreasonable and unjust; and it must have the effect of producing illusion or confusion in the mind of the testator, so as either to overcome free agency, or power of judging upon the true relations between himself and those who might be supposed to have just claims upon his bounty." 1 Redfield on Wills (3 Ed.), sec. 38, par. 38. "It must not be

such as arises from the influence of gratitude, or esteem, but it must be the control of another will over that of the testator, whose faculties have been so impaired as to submit to that control, so that he has ceased to be a free agent, and has quite succumbed to the power of the controlling will." [Ib., sec. 38, par. 47; Carl v. Gabel, 120 Mo. 283.] "The influence must be such as amounts to moral coercion." [Norton v. Paxton, 110 Mo. 456. See, also, Von De Veld v. Judy, 143 Mo. 348.]

Now there is no evidence in this case that defendants or either of them exercised any influence over their father to get him to execute the deeds to them, but the weight of the evidence does show that he executed them of his own volition, giving as a reason therefor (as one witness expressed it) that "the boys had worked and improved the land and helped to care for him and his wife, and he did not think it right to give their work to the girls." There is an entire failure of proof upon this point.

It is also contended that the evidence tended strongly to show the want of capacity in the grantor to execute the deeds. While there was evidence tending to show that from the time the grantor was stricken with paralysis up to within a few days before he executed the deeds, he was very feeble, helpless, and part of that time did not recognize members of his own family and could not talk, the physician who attended him testified that while he could not speak, he could probably recognize; that the intellectual part of his brain was not affected, and that his mind was all right by the eleventh day of September, while the deeds were executed on the twenty-fifth next thereafter. That he was in possession of his mental faculties at the time he made the deeds although weak and infirm from old age was shown beyond any question. He not only gave the directions for their preparation, but gave the description of the various tracts of land by metes and bounds, and arranged with his sons for the payment by

them to each one of his daughters and his grandson a certain amount of money, so as to make them equal with each other, money which they accepted.   His conveyance of the land to his sons was in accordance with a purpose theretofore often expressed and with which he thereafter expressed satisfaction.   That he shed tears when one of his daughters said to him that she was dissatisfied with the way in which he had disposed of his property does not tend to show that he was incapable of making the deeds, or that he regretted having done so.   Upon the contrary, when informed by Taylor that the parties had been inquiring about the deeds, he replied "that he could not help it if they were, that it was the way he wanted it."

Moreover on April 20, 1894, he made his will by which he disposed of his personal property among his children and grandson, in which he referred to the deeds that he had made to his sons, and to the fact that, as a consideration for them, the sons were to pay to each of his daughters and his grandson $500.   He also stated in the will that he had always intended that his sons should receive a larger amount of his estate than his daughters and that he had given them a larger amount. His capacity to make the will is not questioned, and it shows if any further evidence were necessary what his purpose always had been as to the disposition of his lands.   He had the right to dispose of his property according to his own ideas of right and justice, if of sufficient capacity to do so, regardless of whether he distributed it equally among those who were equally entitled to his bounty or not.

Cutler v. Zollinger, 117 Mo. 92, was a suit by the grantor in the deed to set it aside upon the ground that she was of unsound mind when she executed it, and it was ruled that while the grantor in a deed may avoid it by showing that he was *non compos mentis* at the time of its execution, yet the mere fact that his mind was impaired by age or disea[se] not render him incompetent to make the conveya[nce]

that the legal test is the capacity to understand the nature and effect of the transaction.

That Mr. Groom knew perfectly well the nature and effect of the transaction at the time he executed the deeds is shown beyond any question, and while the burden was upon plaintiffs to show to the contrary, we think they not only failed to do so, but that the evidence largely preponderates in favor of the defendants.

The judgment should be affirmed, and it is so ordered. GANTT, P. J., and SHERWOOD, J., concur.