CHARLES H. GOOD, Executor, *et al.,* Appellants, v. JOHN R. ZOOK, HENRY DAVIDSON, ISAAC TRUMP, Trustees and Brethren in Christ Church.

**Deed from Parishioner to Clergyman:** UNDUE INFLUENCE PRESUMED.
A clergyman who is a grantee in a deed from a parishioner, although deriving no benefit therefrom, has the burden of showing good faith in the transaction, as the law presumes that he is guilty of undue influence.

*Same.* Where a person enfeebled by age and illness, and susceptible to influence, conveys property to his pastor, in trust for the parish, greatly in excess of its needs, and in addition to previous liberal gifts, and contrary to his intentions, expressed before and after making the conveyance, and the pastor had opportunities to exert undue influence, the law presumes that the conveyance is invalid, and, in the absence of evidence overcoming the presumption, the conveyance must be set aside.

*Appeal from Polk District Court.*—HON. S. F. PROUTY, Judge.

THURSDAY, DECEMBER 19, 1901.

ACTION in equity by the executor of the estate of Charles Good, deceased, with whom are joined three of the

four heirs at law of said deceased, to set aside a deed of certain real estate made by Good to the persons named as defendants in their capacity as trustees of Brethren in Christ Church.   There was a full trial of the issues presented, and, upon the evidence adduced, the district court entered a decree dismissing the petition at plaintiffs' costs, and they appeal.—*Reversed.*

*B. A. Younker* and *John I. Dille* for appellants.

*S. F. Balliet* and *E. H. Addison* for appellees.

WATERMAN, J.—Some conceded facts may well be stated at the outset, for they form the framework of this case.   Charles Good died in the month of March, 1898, in the ninetieth year of his age.   He came to the city of Des Moines in the year 1850, and, by frugality and industry, accumulated a large estate.   He had been a widower for many years, but left four children, the plaintiffs, and Samuel M., who is not a party to this action. In December, 1891, deceased suffered a paralytic stroke. In 1893 he had another slight attack, and this was followed, in 1894, with still another stroke.   Increasing years, together with these attacks, affected deceased, both bodily and mentally.   From about the year 1896 he was so feeble, physically, as to require the constant services of a personal attendant, and he was obliged to have assistance in attending to his business affairs.   We shall speak more in detail of his mental condition later on.   In August, 1894, after the third stroke of paralysis, deceased made a division of a large part of his property among his children.   In this transaction he gave to each of three of his children property of the approximate value of $90,000, and to the fourth, Mrs. Nysewander, property worth about $75,000.   The intention of the donor seems to have been to make the shares equal, considering advancements made prior thereto.   The

property thus transferred consisted in greatest part of what
is known as the "Good Block," situated in Des Moines. At
the time of making this division, the donor took back from
his children mortgages on said block, aggregating in amount,
$20,000, together with an agreement in writing, requiring
each of his three elder children to pay him the sum of $100
per month during his life, and the youngest child, Mrs.
Nysewander, to pay him, for the same time, $75 per month.
These mortgages were released by decedent on the day fol-
lowing the execution of the first deed to defendants of the
property in controversy. After this division of property
decedent retained a lot in what is styled the "Vineyard,"
in Des Moines, certain church property in Altoona in this
state, the lot in controversy, and the personal property above
stated, consisting of his children's obligations. We digress
now for a time. Mr. Good was always a devout man, and
some time prior to the transaction complained of, became
interested in the denomination of Brethren in Christ, or,
at least, a denomination of similar belief and practice. At
any rate he joined this body in 1895, and was a constant
attendant on their services thereafter, so long as he was able
to be about. In the month of August, 1895, he made a deed
of gift of the Altoona property to defendant church. The
value of this we are unable to discover. In the year 1896
he built for said denomination, in Des Moines, a church
building, costing several thousand dollars, and with a seat-
ing capacity of 400, while the local membership was then
about 6, and, at the time of the trial below, had increased
to only 13. On June 21, 1897, Good made a deed of the
property in controversy, lot 7, block 1, Good's Central addi-
tion to the city of Des Moines, worth $20,000, to the indi-
vidual defendants, as trustees of the Brethren in Christ
Church. This deed contained no conditions. It was not re-
corded until January 22, 1898; and none of testator's chil-
dren had any knowledge of its execution until it was placed

of record, although Good's youngest child, Mrs. Nysewander, who then resided upon the property, had so resided there for more than 20 years. This deed, it seems, was made upon the understanding that the grantor should have a reconveyance at any time he desired. On February 2, 1898, such a reconveyance was made to Good by defendants, and on the eighth day of the same month he made another deed to the same grantees named in the first one. This last deed contained this condition, after the granting clause: "The same being held by them and their successors in office, for the use of said Brethren in Christ Church, so long as used and kept in good faith by said church and no other, as a world-training mission, and for mission work; and if said officers, shall vacate, or cease to use, said premises for said purposes, in good faith, for a period of one year, at any one time after the expiration of four years from this date, or if said church and its officers shall suffer said premises, or any part thereof, to be sold for taxes or assessments of any kind whatever, then, in case of either of said events taking place, the title to said premises shall immediately revert to and become vested in me, or, in case of my death before the happening of such event, then to my lawful heirs." It is this conveyance which is sought to be set aside.

The grounds of the action are: (1) The mental incapacity of the grantor; (2) undue influence exerted upon him. We are inclined to think the two deeds to the church must be treated as a single transaction. The mental incapacity of the grantor at the time of making the first conveyance is therefore the vital issue on this branch of the case. We are not going into the testimony in detail on this subject, for we dispose of the case on the other ground. As is usual in controversies like this, the testimony is in conflict. Even the experts, of whom a number were called, disagree. There are, however, some undisputed facts, to which we wish to call attention, because, in the view we take of the case, they have a bearing on the issue of undue influ-

ence.   At the time this first deed was made, Good had so
lost his ability to transact business that he had to have assist-
ance in trivial matters.   About the time of the making of
this deed he failed to recognize, and could not by effort be-
made to know, a person with whom he had been previously
well acquainted.   In May, 1897, he was unable to recognize
a physician of Des Moines, who visited him, and with whom
he had been acquainted many years, and was on friendly
terms.   In 1896, decedent lost himself in the streets of Des
Moines but a short distance—perhaps within a block—of
the property where he had resided for 40 years, and had to
be directed to the church, to which he was going, and of
which he had been long a regular attendant.   Before the
year 1897, Good claimed to have visions, and said he was
in communication with the spirit of his dead wife.   In the
early part of the year last mentioned he asserted that he had
been instantly transported at one time, by some miraculous
power, from one part of the city to another.   During the
last few years of his life his feelings on the subject of re-
ligion became acute, to the extent that conversation upon it
induced him to freely shed tears.   So, too, his ideas became
confused, and his conversation disconnected, and often in-
coherent.   We have not set out all the facts of his condition;
but those stated are not in dispute.   The weight of the ex-
pert testimony is that he was mentally unsound, and in-
capable of intelligently transacting business at the time of
making the last deed; and some of these witnesses fix this-
condition as existing when the first deed to defendant was-
made, and prior thereto.   The opinions of the experts on
both. sides were based largely upon facts learned by them
through a personal examination of the patient, had in
March, 1898.   We intend to express no opinion as to the
capacity of Good, if not unduly influenced, to contract in
June, 1897; but the facts we have set out will serve to jus-
tify our finding that at that time he was mentally weak,
and in a condition to be easily influenced through the me-

dium of religion, which was the subject of his almost constant thought. We turn then to the issue of undue influence. The relation of clergyman and parishioner, as the books term it, or, perhaps more properly, of spiritual adviser and the subject of his ministrations, is of a confidential nature, and raises a presumption of undue influence on the part of the former in case of a contract between them. Or, stating it differently, where such spiritual adviser obtains a devise or grant or gift from a member of his flock, the burden is upon him to show the entire good faith of the transaction. Pomeroy, Equity Jurisprudence, section 963; Cooley, Torts, 530; *Ford v. Hennessy*, 70 Mo. 580. It makes no difference in the rule that the minister received no personal benefit from the transaction. The principle cannot be evaded by giving interests to third persons instead of reserving them to the one who exercises the undue influence, or who is presumed to do so. *Ranken v. Patton*, 65 Mo. 378; *Ford v. Hennessy, supra;* Cooley, Torts, 530. Undue influence is such influence as causes the subject to act against his own preference or desire. We will now examine the evidence on this branch of the case. First, as to the real intention of the donor: The gift was out of all proportion to the needs, present or prospective, of this church, to which Good had already been extravagantly generous. It was the last piece of real estate he possessed, and yet he left a will in which he ordered generally the sale of real estate and the disposition of its proceeds by his executors. He had expressed his intention of keeping this particular piece of property until his death, and leaving it then to his children, or to one of them. The secrecy of the grantor with relation to the making of these deeds is also a fact to be considered in this connection. Taking these matters together, and it appears Good's real intent was to retain this property for his children. How was this intent frustrated, for it does not appear ever to have

changed? Zook is the only one of defendants who had personal association or communication with the donor, and he testifies that he did nothing to induce the gift. No other evidence on the subject is offered by defendants. This is a very general and indefinite statement; but, taking it for the most that can be claimed for it, let us see whether it is not overcome by established circumstances. Zook is the pastor of defendant church. He came to Des Moines in the year 1896, and took up his residence in the rear of the church building erected by Good. Naturally he soon became acquainted with Good, and thereafter, to the time of the latter's death, was with him frequently. That he acquired great influence over Good, even in business matters, is beyond question. For instance, Good was a depositor in the German Savings Bank, which was compelled to suspend. The bank desired to continue business, and it was thought to be in the interest of its depositors that it should do so. Their consent, however, was necessary in order to accomplish this. The attorney for the bank went to Good to secure his signature to the agreement. This attorney was well acquainted with Good, having an office in his block, and having acted as his attorney quite frequently before this time. Good declined to commit himself in the matter, but said he would do as his son Henry advised. Henry came and urged his father to sign. The latter still declined to act. Finally he said he would do what "Brother Zook" recommended. Zook's presence was secured. He advised Good to sign the agreement, which the latter did at once, on condition that a part of his deposit was paid to Zook, and this was done. Zook was with Good, as we have said, frequently, —for a time every day. He would write receipts for payments made to Good, count the money for him, and perform other like business services. On one occasion he took a note belonging to Good to an attorney for collection, and made a contract for the latter's fees. After the making of these deeds, Zook maintained the utmost secrecy with relation to

them. When asked at one time whether such a conveyance had been made, he admits he returned an evasive answer, while the questioner testifies that he responded falsely. It is true the property was deeded back to Good, and a new deed taken by defendants, subject to a condition of reversion in case it ceased to be used for church purposes; but, in view of all the surroundings, this fact has but little weight in defendant's favor. When we consider Good's evident susceptibility to influence exerted to induce him to make a disposition of this property contrary to his real desire, his natural intent with relation to it, expressed both before and after the making of these deeds, the almost preposterous magnitude of the gift, the opportunity for the exertion of undue influence, and the conduct of both Good and Zook before and afer the deeds were made, we are forced to the conclusion that the presumption against the validity of the gift has not been overcome; but, on the contrary, the preponderance of evidence shows that it was not the voluntary act of the donor, and the deed must be set aside. We have given the facts quite fully, because we are compelled to disagree with the finding of the learned trial court, and only by this lengthy statement can we make clear the grounds upon which we reach the result announced.— REVERSED.